CALLOWAY, J., Ad Hoc.
11 This matter involves a.family dispute between a nephew, as executor of his late father’s estate, and an uncle concerning a family-owned corporation. Bradley Kyle Smith (“Bradley”), independent executor for the Succession of Perry Joe Smith (“the éstate”), is appealing a judgment that denied his petition for the discontinuance and disposition of P.K. Smith Motors, Inc. (“P.K. Smith” or “the corporation”), and ordered specific performance of a 1984 shareholder agreement under which the estate was required to sell its shares back to the corporation. After valuing the corporation at $1,000,000 and determining $500,000 to be the value of the estate’s 50 percent ownership, the trial court found that the decedent, Perry Joe Smith (“Perry”), was indebted to the corporation in the amount of $168,469.65. This amount was offset against the court’s valuation of the corporation, thereby reducing the buyout of the'estate’s shares to $386,580.85. For the reasons set forth in this opinion, we now affirm the trial court’s judgment.
FACTS

Brief History of Corporation

Mr. P.K. Smith and his wife, Marjorie Smith (“Marjorie”), with their sons Perry and Kenneth Michael Smith (“Mike”) as directors, incorporated “P.K. Smith Chevrolet Company, Inc.” on January 18, 1974. The corporation was renamed “P.K. Smith Motors, Inc.” in 1989.
After Mr. P.K. Smith’s death, the shareholders held a special meeting on March 28, 1983, during which they adopted a resolution vesting the business affairs of the corporation in Mike and granting him authority on |2behalf of the corporation to conduct all- banking business, to execute all contracts with General Motors (“GM”) and General Motors Acceptance Corporation (“GMAC”), and to execute documents necessary for the routine conduct of the business. The resolution also granted authority to Janice O’Neal (“O’Neal”), a P.K. Smith employee, to conduct banking and execute contracts in the routine conduct of the business. Both Mike and Perry continued to serve as officers and directors of P.K. Smith.
On June 19, 1984, Marjorie, along with Perry, Mike and their spouses, signed an agreement restricting the purchase and sale of P.K. Smith’s shares of the corporation during the lifetime of a shareholder and upon the death of a shareholder. The agreement also provided for disposition of those shares considered community property in the event of divorce, death of spouse, or termination of the community regime. To sell his shares during his lifetime, a shareholder was first required to notify the corporation, which had an option to purchase any such shares. If the corporation failed to exercise its option, then the other shareholders had an- option to purchase the shares. Thereafter, the divesting shareholder could dispose of any shares not purchased by the corporation or other shareholders. Similarly, the agreement granted the corporation an option to purchase all or any part of the shares deemed community property. Regarding the purchase and sale of shares upon the death of a shareholder, the agreement provided:
4. Upon the death of a stockholder, the Company, to the extent that it may lawfully do so, shall be obligated to buy and such stockholder shall be obligated to sell, all shares of Company stock *329 owned by the deceased stockholder at his death. The purchase price | ¡¡for, such shares shall be paid in cash ... within 60 days following the qualification of the succession representative of the deceased stockholder. If the Company shall be unable to lawfully purchase all such shares, it shall, within 30 days following the qualification of the deceased stockholder’s succession representative, so notify the Company’s other stockholders, who shall have the option, exercisable within 15 days following the giving of such notice, to buy, pro rata, all or any part of the shares which the Company may not lawfully buy.
The agreement also included the following provision:
PURCHASE PRICE '
7. The purchase price for each share of stock purchased pursuant .to. this Agreement shall be $_:_, unless and until such per share value has been superseded by a new per share value established by the vote of at least 75% of the total voting power of the Company at the annual meeting of its shareholders[.]
After Marjorie’s death in 1997, Mike and Perry became the sole shareholders of the corporation, with each¡ owning half the shares. The brothers operated the corporation without the discord that developed after Perry’s death on November 27, 2009.

Procedural History

On January 16,2013, the estate filed suit against Mike and P.K. Smith, seeking to discontinue the business and dispose of its assets under former La. R.S. 12:143(C), which provided:
C. When a corporation has only two shareholders, each of which owns one-half of the outstanding shares of each class, and those shareholders are engaged in a joint venture solely between themselves and the corporation, then either shareholder may, unless the articles expressly prohibit dissolution pursuant to this Subsection, file a petition stating that it desires to discontinue such joint venture and- to dispose of the assets used therein in accordance with a plan to be agreed upon by both shareholders. ■ Such petition, to which shall be attached a copy of the proposed plan of discontinuance and distribution, shall be served on the corporation and on the other shareholder. -Unless both.shareholders •file with the court. (1) -within three months of the date of last service of such petition, a certificate 14that they have agreed on such plan, or a modification thereof, and (2) within one year from the date of last service of such petition, a certificate that the. distribution provided by such plan has been completed, the court may proceed with involuntary dissolution of such corporation.
Attached to the petition was a proposed plan that called for a qualified third party, selected by shareholder agreement or by the court in the event of disagreement, to value the business for sale as a whole. Thereafter, the shareholders would have 30 days to agree to a sale between themselves. If neither agreed to sell his shares to the other, then a broker would be engaged to seek a purchaser. If not sold within 'six months, then another appraiser would be selected to value the individual assets for liquidation.
In their answer and amended answer, the defendants expressly opposed. the estate’s proposed plan and filed a number of claims as reconventional demands. They sought specific performance of the 1984 shareholders’ agreement, which they asserted required sale of the estate’s shares to either the corporation or to Mike. They asserted a claim for $161,735.04 and “other amounts” allegedly owed to P.K. Smith by *330 Perry at the time of his death. Finally, they alleged that Bradley acted in bad faith as executor and breached fiduciary duties owed to P.K. Smith by failing to execute documents for renewal of its line of credit with the Bank of Winnfíeld and a floor plan financing loan with GMAC.
In response to the reconventional demands, the estate filed various exceptions, including a declinatory exception of lis pendens as to the claim for money owed by Perry. The estate asserted that the same claim had been |5filed as a reconventional demand in a separate pending matter between the same parties, No. 43,171, Succession of Perry Joe Smith v. Kenneth M. Smith and P.K. Smith Motors, Inc., also filed in the 8th JDC. The trial court denied the exception of lis pendens, and this court denied supervisory review.
On December 10, 2013, the defendants filed a proposed plan pursuant to La. R.S. 12:143(0). Noting Bradley’s lack of experience in running a car dealership and the harmful effects of liquidation on P.K. Smith’s employees and the local economy, they offered to buy the estate’s shares. In the absence of an agreement on the purchase price, they, proposed that the court conduct a hearing to determine a fair value or price. They would either pay the judicially determined price or else agree to liquidation. Only then would the court appoint a liquidator. The trial court signed an order in accordance with this proposed plan and set a trial date for February 2014;
The estate objected to the plan, and filed h motion for summary judgment seeking to proceed with dissolution. It also filed a motion for partial summary judgment on the claim for specific performance of the 1984 shareholders’ agreement. The estate argued that because it lacked a price, it was an unenforceable buy/sell agreement. The trial court denied both motions prior to the start of trial.

Trial Testimony

Bradley, age 36 and a financial advisor, was the first to testify.[1] Bradley stated that his father, Perry, had been a director and officer of P.K. RSmith and was its successor dealer in the franchise agreement with GM. Perry had also been a P.K. Smith employee, had been paid about $3,000 per month, and had been a signatory on the corporate checking account. He testified that his father and Mike had also been in involved in other businesses together over the years, including a farm and cattle operation, rental properties, a Popeye’s franchise, and an oil and gas business. •
Bradley testified that since Perry’s death, Mike had been in control of P.K. Smith. Though Bradley tried to become involved in its operations and to assume the same position his father held, Mike had not welcomed or allowed his involvement. Bradley had worked at P.K. Smith for a few months after college, but had no other experience there. Despite a number of requests from the estate’s attorney, Mike initially refused to hold a shareholders’ meeting to fill Perry’s vacant director position. Whén' a meeting was finally held, Bradley voted for himself, whereas Mike nominated and voted for a longtime P.K. Smith employee. Thus, they were at a deadlock. Bradley testified that his requests to see P.K. Smith’s records were initially rebuffed. Even attempts to hold a meeting to discuss matters relevant to the franchise agreement with GM were met with resistence from Mike.
When asked why the estate was Peeking to dissolve P.K. Smith, Bradley explained that the estate had received no profits, *331 dividends, or anything of value from it since Perry’s death. • However the estate has been expected to guarantee P.K. Smith’s debt. He explained that Perry had been a guarantor for financing from GMAC and on a loan from the .-Bank of 17Winnfield. Bradley testified that GMAC requested that he, as succession representative, obligate the estate on the debt. He refused because he believed Mike was mismanaging P.K. Smith. Bradley claimed that Mike had been acting unilaterally without any involvement by the estate and had “kept the estate in the dark” about P.K. Smith’s finances.
On cross, Bradley admitted that he and his mother were beneficiaries on a life insurance policy paid for by the corporation. He claimed that they had received about. $200,000; other testimony in the record indicated that they had received upwards of $500,000. Bradley could not answer questions about whether his father owed money to P.K. Smith, and he admitted that since filing suit he had not hired an accountant to examine the corporate records. Bradley also admitted that his father did not have a designated office at the dealership. Instead, he used a table in the coffee room as a his desk, as needed. Bradley admitted that after Perry died, Mike honored an agreement he had with Perry to partition their rental properties.
Regarding his petition, Bradley stated that he never wanted to shut down P.K. Smith and that he had no idea what the cost of liquidating it might be. He agreed that he would accept a “fair value” and allow P.K. Smith to continue.
Mike testified that P.K. Smith was originally set up with his parents, himself and Perry each owning 25 percent of the shares. The brothers each became 50 percent owners after, the death of" their mother in 1997. From that time on, Mike and Perry were the only directors, and- both were officers.. Mike had been the dealer-operator and president since his father’s death in R1983. He admitted that Perry had been vice-president, the successor dealer under the GM franchise agreement, and a guarantor, on loans from GMAC and the Bank, of Winnfield, but he claimed Perry had no real role at P.K Smith.
Mike stated that he -and Perry went into other businesses together, as testified by Bradley. According to Mike, his father had intended for him to be in charge of the dealership and for Perry to run the oil and gas business. Therefore, he ran the dealership and made the “leadership decisions,” and Perry did the same for the oil and gas business until they sold it in 2005.
Mike stated that P.K. Smith had been paying Perry $3,300 per month in salary at the- time of his death. It had also been paying Perry’s life insurance, health insurance, and gas expenses for him . and his wife. . Mike claimed ■ that Perry had an “open account” which- he used to make draws against his salary as needed. Mike said that Perry began borrowing money from P.K. Smith after purchasing a new home in the. early 2000s. He claimed that Perry also owed for personal credit card expenses paid by P.K. Smith. Mike admitted that he also made draws and owed money to P.K. Smith at times, but he claimed to have paid back over $40,000. Additionally, Mike admitted that he had taken over $160,000 out of P.K. Smith after Bradley contacted GM about his issues and that he had returned the money so that P.K. Smith would not be undercapi-talized.
Mike testified that lie receives a salary and that P.K. Smith, pays for. his life insurance, health insurance, and-gas used by his family. He also testified that his salary increased since Perry’s death from about $36,000 to |fl$60,000 because he had “lots more responsibilities and things I had to *332 do.” When questioned about various expenses, which the estate contended were personal and' not for the benefit of the corporation, Mike explained that he operates P.K. Smith just as he did before Perry’s death and that it does a lot of things for the community and its employees. He also entertains for business pur-» poses. Regarding why the estate had not received any profit since Perry died, Mike explained that P.K. Smith owed over $400,000 in debt associated with the dealership and that the estate benefitted from payments on this debt.
Admitting that he has not consulted Bradley about P.K. Smith business, Mike insisted that he is authorized to make decisions and run P.K. Smith by the 1983 resolution passed by the shareholders after the death of Mr. P.K. Smith. Mike also testified about the 1984 shareholder agreement signed by him, Perry, their wives, -and their mother to govern the sale of shares in the event a family member wanted out or died. He stated the purpose of the agreement was to keep P.K. Smith in the family. When questioned about the blank in the purchase price provision, Mike explained that, due to volatility in the oil business and plummeting car sales at the time the agreement was executed, they were not able to include a price or share value that-would be relevant at some future time. Instead, they intended that a fan- market value would be determined when needed.
Mike testified that after Perry’s death, he made a verbal offer to Bradley to buy the estate’s shares as provided by the shareholder agreement. Admittedly, he did not offer a specific price. Mike stated that he had | ^honored his agreement with Perry about dividing their rental property, but Bradley would not honor the shareholder agreement. Mike testified that he was willing to pay a fair value for the estate’s shares in conformity with the shareholder agreement. But Mike admitted that, after receiving notice of Bradley’s appointment as executor of Perry’s estate, he had, not taken the steps set forth in the shareholder agreement for purchasing Perry’s shares.
In rebuttal, Bradley denied receiving any offer from Mike for the estate’s shares. He recalled that they met about dividing the rental property, but he did not recall any discussion about P.K. Smith other than Mike saying, “I don’t know what we’re gonna do about the dealership.”
Diane Smith, Perry’s widow, testified that Perry received a salary, plus benefits, from P.K. Smith and that it continued to pay the salary plus her health insurance for four to five months after he died. She testified that Perry ran P.K. Smith while Mike was involved in politics, but she also admitted that Perry spent half his time working the farm he owned with Mike. She recalled that Perry had, at times, taken money out of P.K. Smith in addition to his salary, and she claimed that Perry told her that Mike would take the same amount to even things out between them. She denied ever seeing statements indicating that Perry owed a debt for these draws. Noting that she was “always having to sign something,” Diane- did not recall signing the shareholder agreement, and she did not recall-any discussions about a price for the shares.
O’Neal, P.K. Smith’s office manager and employee of 48 years, testified that she is the person most knowledgeable about its finances |T1because she balances the books and prepares the monthly financial statements required by GM. O’Neal explained that P.K. Smith had a petty cash drawer to which $1000 was allotted each day. If cash was taken and not paid back that day, a signed voucher for the amount taken was placed in the drawer. Mike and Perry *333 also had the use of business credit cards. Whether their charges were business or personal was determined by Cheryl Miller (“Cheryl”), an employee under O’Neal’s supervision. According to O’Neal, Cheryl reviewed the monthly credit card statements, categorized the expenses as business or personal, and reconciled all the statements. Personal expenses were to be reimbursed to P.K. Smith.
O’Neal testified that Perry’s “open account” balance included his personal credit card expenses, advances against his salary, and petty cash vouchers.. She stated that when he needed extra money, .such as when he was overdrawn on his banking account, she would write a check to him and charge it to his account. O’Neal prepared account statements on the 25th of each month. She said that Perry would speak to her whenever he had questions about his account and that she would show him the supporting documentation. He was always satisfied. Perry would tell her each month whether he wanted to apply some of his salary toward his account balance. Generally, Perry’s balance increased each month.
O’Neal stated that a balance was still owed on Perry’s open account. At the time of his death, the ' balance was $161,735.04. Credit card charges totaling $1,092.06, that were on statements after his death, were added to his account balance for a total of $163,469.65. ,. O’Neal affirmed that she |12was comfortable that the balance on Perry’s open account was correct. She also testified that Mike had an open account but that he paid the balance by check “every so often.” He did not then owe on his account. ,-
On cross, O’Neal admitted that she did not have supporting documentation for all the charges to Perry’s account and that her records began on December 27, 1993, when Perry had a balance of $62,234.89. She explained that when P.K. Smith had a good month, Mike and Perry would get equal credits on their accounts to ■ draw down their-balances.
Michael Graham (“Graham”) testified on behalf of P.K. Smith as an expert in real estate appraisal. In 2011, Graham appraised P.K. Smith and its land, over 13 acres. His extensive- report dated April 19, 2011, was introduced into evidence. Graham appraised the dealership at $800,000, the excess land abutting the dealership at $170,000, and the additional 1.41 acres located across the street from the dealership- at $168,905.. Graham explained that he determined these values by identifying the highest and best use of the property, completing a cost approach to determine what it would cost to build a similar facility, and comparing other dealerships in similar, competing areas. He also used a similar sales approach to value to excess lands .around the dealership. Graham explained in detail how he. completed the cost approach, which included factoring in total depreciation of 75 percent based' on his evaluation of the market of comparable sales.
Additionally, Graham appraised the same properties as of November 27, 2009. This valuation was essentially the same as in 2011, with the dealership, at $760,000, the excess land at $170,000, and the 1.4-acre tract at 11S$168,905. He did not believe that there had been any substantial change in market conditions between 2009 and the time of trial.
Graham’s appraisals were, used by Larry Sikes, a C.P.A. who also testified on behalf of P.K. Smith as .an expert in .business valuation of closely held companies. Sikes was asked to determine a fair market value for P.K.-Smith Motors as of January 16, 2013. In addition to Graham’s appraisals, Sikes looked at monthly financial statements and tax returns from 2007 through *334 2012, the articles of incorporation, and other corporate records. He also reviewed financial statements submitted - to GM through February 2014. Sikes explained the three different approaches or methods for determining fair market value (the net asset approach, the income approach, and the market approach).
Sikes used the. net asset approach because he believed it would generate the highest vajue. He also explained that, in applying the net asset approach, one.can look .at. either the liquidation, value of the business or the going concern value. Because P.K. ¡Smith had been operating for years, he did not believe the liquidation value was appropriate to use. Therefore, Sikes valued the business as a going concern.
Using Graham’s 2009 and 2011 appraisals, Sikes first valued the corporation at $1,370,553 and $1,397,397, respectively. He applied a 20 percent discount for the lack of marketability inherent in a closely held corporation, as well as a 10 percent discount for lack of control, which took into consideration the control exercised over the dealership by GM. In the end, Sikes valued.the corporation at around a million dollars.
|14On cross, Sikes stated that his valuations'were not based on audited financial information, but he did review detailed financial statements required by GM on a monthly basis. These added to his comfort with the financials used in determining a fair market value.
David Brewer, the estate’s expert in commercial real estate appraisals, valued the dealership at about $2 million as of November 27, 2009, the date of Perry’s death. However, questions on cross-examination revealed a number of mistakes and misstatements in Brewer’s report, especially in - his ;rsales comparisons. Brewer used- dissimilar businesses, such as a furniture store and a Fresh Market grocery store, as well as businesses located in affluent areas of Georgia and Tennessee. He agreed with P.K Smith’s counsel that these were not comparable to the dealership. He explained that the shortage of automotive service buildings in the market made it difficult to obtain a comparable. Brewer also admitted that parts' of his report mistakenly included items cut and pasted from other documents. Brewer admitted that a section that was purportedly based on discussions with local contractors was untrue, as he had not spoken to any contractors. With regard to his appraisal of the improvements, Brewer used an effective age of 10 years for the main dealership building even though it was built 50 years ago. He then used a 33 percent depreciation, whereas Graham had used a 75 percent depreciation value. Brewer admitted that if he used the' same depreciation as Graham, his valuation under the cost approach would be similar to Graham’s.
Ronald Gagnet (“Gagnet”) was accepted by the court as an expert | ,fiC.P.A. and certified evaluation analyst. He prepared a business evaluation of the corporation as of November 27, 2009, the date of Perry’s death, to determine the value, meaning fair market- value, of a 50 percent interest. His valuation was based on Brewer’s appraisal. Gagnet explained that a valuation has three approaches, which he referred to as the net adjusted asset value, the-income approach, and the market approach. He did not believe that P.K. Smith was making enough income to use the income approach, and he did not believe the market approach, should be used due to turmoil in the automotive industry. . Thus, he valued P.K. Smith by determining the value of its assets and subtracting its liabilities to get its equity or value.
*335 Gagnet also explained the difference .between the terms “fair value” and “fair market value” in that discounts for lack of control and lack of marketability, are not taken into consideration when determining the “fair value” of a business. He stated that “fair market, value” is used when a seller wants to know what his business is worth. When asked to review the . share;, holder agreement, Gagnet agreed that nothing in it indicated how P.K. Smith was to be valued; it just showed that the parties to the agreement would write in a purchase price.
, Gagnet valued P.K. Smith as a going concern, as had Sikes. He looked at financial statements and tax returns for the years 2005 through 2009, as well as Brewer’s real estate appraisal. Gagnet came up with a total adjusted entity value of $2,740,243. He then applied an IS percent discount for lack of marketability and came up with a 50 percent interest valued at|1fi$l,l23,500. He did hot use a discount for lack of control, as discussed by Sikes.
Questions on cross by P.K. Smith’s counsel showed that Gagnet’s higher valuation incorporated adjustments he made based on the Brewer appraisal. These greatly increased the equity. Using Graham’s appraisals, Gagnet calculated the value of a 50 percent interest in the corporation at $673,320, an amount much closer to Sikes’ valuation.

Ruling of the Trial Court

After four days of trial testimony and the introduction of. numerous exhibits, the trial court gave written reasons for judgment on January 2, 2015.[2] The trial court found that the estate did not carry its burden under La. R.S. 12:143(C) to discontinue and dispose of the assets of the corporation. . Instead, the court found there was a meeting of the minds as to the shareholder agreement for the purpose of keeping .the shares in the family in the event of a shareholder’s death. Although the agreement did not specify a price for the shares, the trial court found that it required determination of a “reasonable price.” Regarding the expert testimony, the court found Brewer’s testimony unreliable due to “severe flaws in his methodology and ultimate conclusions.” The court accepted Graham’s appraisals and the valuations based upon them. Accordingly, the court determined the “fair value” of the corporation to be $1 million dollars and set the purchase price for the estate’s 50 percent at $500,000.
Regarding the reeonventional demand for the balance due on Perry’s |17account, the trial court found, the testimony of O’Neal to be “highly credible.” Based on her testimony and the evidence submitted, the court found that the estate owed $163,469.65 to the corporation and that this amount could be deducted from the pur-' chase price for the estate’s shares. Thus, the. corporation was ordered to pay the estate $336,530.35 within 30 days from the date of final judgment. A final judgment in accordance, with these reasons was signed on February 10,2015.
DISCUSSION
The estate asserts ten assignments of error challenging the findings of the trial court. It asserts that the, trial court erred in finding that it failed to satisfy the burden of proof, under La. R.S. 12:143(C), in enforcing the 1984 shareholder agreement, in permitting expert testimony, in making credibility determinations, and in determining a price for its shares. As to the *336 “open account” claim, the estate argues that the trial court erred in denying the exceptions of prescription and lis pendens, in finding that defendants met their burden of proof, and in awarding more than the amount pled.. Overall, the estate asserts that the trial court erred in not considering the evidence of Mike’s self-dealing and mismanagement.
This was a fact-intensive case that required the trial court to listen to hours of testimony, including expert testimony, and review volumes of exhibits. The trial-court’s factual findings will not be overturned unless they are clearly wrong or manifestly erroneous. Foley v. Entergy La., Inc., 2006-0983 (La.11/29/06), 946 So.2d 144. If the factual findings are reasonable in light of the record reviewed in its entirety, we may not reverse lleven though convinced that, if sitting as the trier of fact, we would have weighed the evidence differently. Id.; Stobart v. State, through DOTD, 617 So.2d 880 (La.1998). Where there are two permissible views of the evidence, the factfinder’s choice cannot be manifestly erroneous or clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989).
The manifest error standard of review demands great deference to findings based on the credibility of witnesses. Id. This is because only the factfinder has knowledge of the variations in demeanor and tone of voice that bear so heavily on a listener’s understanding and belief in the testimony. Foley, supra. The rule governing review of credibility determinations applies to the evaluation of expert testimony, including the resolution of conflicts in such testimony. Id.; Lasyone v. Kansas City Southern R.R., 2000-2628 (La.4/3/01), 786 So.2d 682.

Enforcement of Shareholder Agreement and Denial of Petition for Discontinuance

In short, the estate argues that the trial court erred in enforcing the shareholder agreement and in finding that it did not satisfy the burden of proof under La. R.S. 12:143(C). The estate argues that the shareholder agreement is an unenforceable contract to sell because it does not include a price.
P.K. Smith counters that whether to grant dissolution under La. R.S. 12:143(C) is within the trial court’s discretion. Moreover, the trial court was correct in enforcing the shareholder agreement and determining a “reasonable price” based on the expert testimony. P.K. Smith asserts that such testimony was relevant, particularly in light of Bradley’s testimony that 119he would accept a fair value for the estate’s shares and Mike’s testimony that he and/or P.K. Smith was willing to pay a fair price. ' -
The 1984 shareholder agreement signed by Mike, Perry, their spouses and their mother addresses the sale of shares during the life of a shareholder, upon .the death of a shareholder, and upon termination of a shareholder’s community property regime. In addition to the provisions quoted previously, the agreement also required the shareholders to deliver their certificate(s) to have placed thereon a legend stating, “The shares represented by this certificate are subject to restrictions on transfer and certain agreements to transfer contained in a certain Agreement dated [June 19, 1984], a copy of which Agreement is available for inspection at the registered office of the corporation!.]” ’ Thus, the parties to the agreement established restrictions on, the transfer of their shares during their lifetime and upon their death.[3] Though *337 the estate argues that the agreem'ént is “a contract to sell that is unenforceable because it lacks a price, we find that the agreement is properly viewed as a transfer restriction.
Transfer restrictions applicable to the mortis causa sale of stock are valid. Louisiana Weekly Pub. Co., v. First Nat. Bank of Commerce, 483 So.2d 929 (La.1986); Stough v. 501 Ranch, Inc., 421 So.2d 1154 (La.App. 2d Cir.1982). Transfer restrictions are strictly construed ,as they affect the free flow of commerce and the free transferability of property. La-Haye Bros., Inc. v. American Sec. Bank of Ville Platte, Inc., 614. So.2d 1381 (La.App. 3rd Cir.1993). Transfer agreements that are unambiguous, that clearly set forth the terms of the agreement, .and thjat were executed by capable parties will be enforced by the courts according to their provisions. In re Succession of Moss, 2006-62 (La.App. 3d Cir.6/21/00), 769 So.2d 614, writ denied, 2000-2834 (La.12/08/00), 776 So.2d 462.
Courts are bound to give legal effect to all written contracts according to the parties’ intent. When the words of a contract are clear, .explicit, and lead to no absurd consequences, no further interpretation may be made to determine the parties’ intent. La. C.C. art. 2046. Courts must interpret a provision that is susceptible of different meanings according to the meaning that renders the provision effective. La. C.C. art. 2049. Moreover, each provision must be interpreted in light of the others so that each is given the meaning suggested by the contract as a whole. La. C.C. art. 2050. Whether a contract is ambiguous is a question of law. Hendrick v. Patterson, 47,668 (La.App.2d Cir.1/16/13), 109 So.3d 475, writ denied, 2013-0670 (La.4/26/13), 112 So.3d 849. Parol evidence is generally admissible to determine the parties’ intent when a contract is ambiguous. Id.
Our review of the shareholder agreement shows it to be clear and unambiguous. In summary, the agreement requires the sale of the deceased shareholder’s shares to the corporation; however, if the corporation 's unable to'lawfully purchase all the shares, then they must be offered to the other shareholders. Any shares not purchased by either the corporation or the other shareholder(s) are then free and clear of the restrictions imposed by the agreement. Considering together the provisions pertaining to transfer |⅞1 during the life of a shareholder, upon a shareholder’s death, and' upon the termination of a shareholder’s community regime, it is clear that the parties to the agreement intended to restrict the transfer of shares to third parties and to keep the ownership of the shares of this closely held, family corporation with one or both of the brothers. In effect, the transfer restriction imposed by the agreement was designed to prevent the type of deadlock that arose here , by requiring the sale of Perry’s shares to either the corporation or the remaining shareholder,- Mike.
After considering the testimony and evidence presented,- the trial court ruled in favor of enforcing the shareholder agreement instead of proceeding with dissolution under former La. R.S. 12:143(C). The specific language of La., R.S. 12:143(C) provides that “the court may proceed with involuntary dissolution of such corporation.” As used in statutes, the word “may” is permissive, whereas “shall” is mandatory. La. R.S. 1:3. Thus, the court *338 is not mandated to order dissolution. In light of Bradley’s testimony that he never wanted to shut down the dealership and, as shown by Mike’s testimony, the willingness of P.K. Smith to purchase Perry’s shares, the trial, court appropriately found in favor of denying relief under La. R.S. 12:143(0) and in enforcing the shareholder agreement.
The trial court apparently considered the enforcement of the shareholder agreement, rather than dissolution of P.K Smith, to be the best resolution of the dispute between these parties. This result that is supported by .the record and is in accordance with the intent of the shareholder agreement. Moreover, it.is an equitable result that maintains. P.K. Smith, | a2which is- operating as a going concern and is important to the local economy. For these reasons we find no manifest error by the trial court in its denial of the estate’s request for relief under La. R.S. 12:143(0) and its enforcement of the shareholder agreement.
We also find no error by the trial court in its determination of a purchase price. 'Both Bradley and Mike testified that they would agree to a fair price. Mike also testified that the parties to the 1984 shareholder agreement did not include a price because of volatility in the oil business and plummeting car sales at that time. Instead, they intended that a fair market value or fair price would be determined when needed. This testimony was uncontroverted. Diane did not" even recall having signed-the shareholder agreement; thus, ’ she- had nothing to offer about the signatories’ intent regarding the purchase price section of the agreement.
In addition, the trial court’s order setting a trial date was signed in conjunction with an opposing plan submitted by P.K. Smith and Mike pursuant to La. R.S. 12:143(0). This plan proposed, in part, that the. court conduct a hearing to determine a fair value for P.K. Smith, upon which they would either pay the estate the value of its shares or agree to liquidation. This proposed plan tracked the requirements of the shareholder agreement. Similarly, the plan proposed by Bradley in his petition Called for the court to appoint a qualified third party to value the business, after which the parties would attempt to agree to a sale between themselves before proceeding either to sell to a third party or liquidate. Ult&ately, both proposed plans depended on the determination of a value or price. In light of all of the |Mabove, both parties were aware that valuation would be at issue at trial, and both had the opportunity over the several months during which trial was held to get and present expert valuation testimony.
. Moreover, we note that the newly enacted Business Corporation Act, La. R.S. 12:1-101 et seq,, now provides that, in a dissolution proceeding brought by a shareholder, either the corporation or . a shareholder may elect to purchase the shares of the petitioning shareholder at a fair value. La. R.S. 12:1-1430(A)(2) and R.S. 12:1-1434. Though this proceeding was filed under the former provisions, nothing in those provisions, specifically La. R.S. 12:143(0), prohibits the court from permitting the purchase of the petitioning shareholder’s shares in lieu of ordering dissolution of a viable corporation.
For all the above reasons, we find no merit to the estate’s argument that the trial court erred in permitting expert valuation testimony. As discussed below, we cannot say that the trial court’s valuation was manifestly erroneous.
The estate’s valuation evidence hinged on Brewer’s testimony, which the trial court found to be unreliable due to “severe flaws in his methodology and the valúa- *339 tions based upon them.” The record supports this factual determination.. Instead, the trial court found the appraisals prepared by Graham and the valuations based upon them to be credible. Sikes», the expert in the valuation of closely held businesses, used Graham’s appraisals to value P.K. Smith at $1,000,000. Gagnet, using Brewer’s discredited appraisal, initially valued it around $2,000,000. However, using | ^Graham’s appraisals, he recalculated this valuation and determined that a 50 percent interest would be valued at $673,320, which was much closer to Sikes’ $500,000 .valuation. As stated, the trial court’s evaluation of expert testimony, including credibility determinations ,and resolution of conflicts in such testimony, is afforded great deference and subject to the manifest error standard of review. Foley, supra; Lasyone, supra. From our review of the record and affording the trial court’s findings great deference, we find no manifest error in its valuation of P.K. Smith at $1,000,000, with the estate’s 50 percent ownership valued at $500,000.

Reconventional Demand for Money Lent

The estate first argues that the trial court erred in finding that the claim for $161,735.04 and “other amounts” owed by Perry to P.K. Smith was not prescribed. . The parties refer to this as either an “open account” claim or a claim for money lent. Both are subject to a libera-tive prescription of three, years. La. C.C. art. 3494. Prescription begins to-run from the date payment is exigible. La. C.C. art. 3495.
As discussed in Double-Eight Oil & Gas, L.L.C. v. Caruthurs Prod. Co., 41,451 (La.App.2d Cir.11/20/06), 942 So.2d 1279, “[t]he mere creation of a debt owed to a party does not give him an action on an open account. Inherent in the concept of an open account is that the account is for services or goods rendered.” ' Here, P.K. Smith did not render any goods or services to Perry. Thus, his unpaid balance cannot be accurately classified as an open account. The record, specifically the testimonies of O’Neal and Mike, shows that both brothers took draws or borrowed money [ mat their discretion and that they paid toward their balances whenever they saw fit to do 'so. ' We find that Perry’s unpaid balance resulting from this ' arrangement is more accurately classified, for purposes of this dispute, as a simple loan. Where, as ííere, there was no specific date of maturity for the loans to Perry, each loan prescribed three years from the time each advancement was made.
However, La. C.C.P. art. 424 states, in relevant part:
A person who has a right to enforce an obligation also has a right to use his cause of action ás a defense.
Except as otherwise provided herein, a prescribed obligation' arising under Louisiana law may be used as a defense if it is incidental to, or connected with, the obligation sought to be enforced by the plaintiff.
This article allows for the use of a prescribed claim as an offset against the main demand. In re Succession of Feingerts, 2014-0140 (La.App. 4th Cir.3/18/15), 162 So.3d 1215, writ denied, 2015-0754 (La.6/1/15), 171 So.3d 936; Hennessey Const. Corp. v. Halpern, 2066-1099 (La.App. 4th Cir.1/31/07), 952 So.2d 739.
We consider a claim for money lent by a corporation to a shareholder to be incidental to or connected with a claim by a shareholder to dissolve and discontinue the corporation, which would ultimately require the, settlement of obligations owed by and to the corporation. Even though the trial court found in favor of enforcing, the transfer restrictions set forth in the shareholder agreement, rather than dissolving *340 P.K. Smith, it equitably offset the prescribed claims for money lent to Perry against the purchase price for the estate’s shares. For these reasons, we find no error in the trial |aficourt’s denial of the estate’s exception of prescription.
Next, the estate argues that the trial court erred in denying its exception of lis pendens based on the initial filing of the claim for money lent as a reconventional demand in the first suit, a derivative action, filed between the parties. If a trial court’s ruling on an exception of lis pendens is based on an erroneous application of the law, rather than the court’s valid exercise of discretion, then the trial court’s ruling is not entitled to due deference on appeal. Krecek v. Dick, 2013-0804 (La.App. 4th Cir.2/19/14), 136 So.3d 261. Under La. C.C.P. art. 531, when there are two or more pending suits on the same transaction or occurrence, between the same parties in the same capacities, the defendant may file an exception of lis pen-dens to have all but the first suit dismissed. The determinative test is whether a final judgment in the first suit would be res judicata in the second suit. Here, that test is not met.
While the reconventional demands in the two suits appear to involve the same parties in the same capacities and to be based on the same transaction or occurrence, the record indicates that, at all times, the second suit (the case sub judice) was being litigated ahead of the initial derivative action. Thus, it is unlikely that a judgment in the first filed suit would ever be considered res judicata as to this suit. This court, on the showing made, denied supervisory review of the trial court’s denial of the exception.[4] In the interest of judicial economy and for the reasons mentioned, we find that the trial court’s denial of the exception of lis pendens was a valid exercise |27of its discretion.
On the merits of the claim, the estate argues that the trial court erred in finding that P.K. Smith met its burden of proof on the claim for money lent and in awarding more than the amount prayed for in the reconventional demand. In its written reasons, the trial court specifically found O’Neal’s testimony to be “highly credible.” Her testimony, with related exhibits, provided the evidentiary basis for the claim for money lent. O’Neal testified in detail about how Perry would take advances on his salary, use his business credit card for personal expenses, use money from the petty cash drawer, and have the business cover overdrafts on his bank account. All these were included in the balance owed by Perry at the time of his death. We note that Mike likewise had an unpaid balance at times due to similar actions.
P.K. ’ Smith produced documentation from 1993 to 2010 of Perry’s unpaid balance. The documents show that P.K. Smith charged Perry an annual rate of 18 percent for any unpaid balance. At the time of his death, Perry’s balance was $161,735.04; however, credit card charges totaling $1,092.06, that were on statements that arrived after his death; were added to his account balance for a total of $163,469.65.
Based on our review of the record and the great deference due the trial court’s credibility determinations, we find no manifest error in the trial court’s finding that the estate was owed $163,469.65 and that this amount could be offset against the purchase price of $500,000 to be paid by P.K. Smith for the estate’s shares.
*341 | ^Lastly, Bradley argues that the trial court was clearly wrong in failing to consider evidence of self-dealing and mismanagement by'Mike in its rulings in this matter. Mike was questioned byucounsel for the estate about various expenses paid on his behalf by P.K. Smith but which the estate asserted were personal. /.The trial court was apparently not convinced that these expenses were of great relevance’to the issues before it. The record indicates that the pending case between these parties, mentioned supra, more directly addresses the estate’s allegations against Mike. Additionally, as pointed out by P.K. Smith, the estate did not produce any expert, such as a C.P.A., to analyze the complained of expenses and address whether they should have been treated differently. Therefore, we find no merit to this argument.
CONCLUSION
Finding no manifest error in the trial court’s ruling and for the reasons stated, we affirm the trial court’s judgment with costs assessed against Bradley Kyle Smith, Independent Executor for the Succession of Perry Joe Smith.
AFFIRMED.
ON APPLICATION FOR REHEARING
Before WILLIAMS, CARAWAY, DREW, LOLLEY and CALLOWAY, Ad Hoc, JJ.
Rehearing Denied.

. Bradley testified that he-has one sibling,- a brother who is mentally disabled.

. The matter was tried over several months on the following dates: February 10 and 11, April 7, and August 14, 2014.

. It does not appear that the actual certificates were introduced into evidence. How *337 ever, neither party has claimed lack of knowledge or notice regarding the 1984 shareholder agreement.

. This court denied supervisory review on March 21, 2014.