GARRETT, J.
11 This matter involves a dispute over the proper interpretation to be given to a depth limitation clause contained in a large sale of mineral interests in 2008, from International Paper Company (“IP”) to Chesapeake Royalty, LLC (“Chesapeake”). The plaintiff here, BRP, LLC (“BRP”), later acquired mineral interests from IP and brought this action seeking a declaratory judgment that it owned all of the Bossier Shale formerly held by IP. BRP appeals from the trial court judgment which denied its request and ruled in favor of Chesapeake. For the following reasons, we affirm.
FACTS
The plaintiff in this matter, BRP, was not involved in the transaction at issue. BRP acquired mineral interests from IP after the transaction occurred. By way of background, IP owned thousands of acres of land in Bienville, DeSoto, Red River, and Sabine Parishes. It decided to sell off some of its mineral rights. Prior to the sale involved in this matter, David Hooper managed IP’s mineral interests. In 2008, during the height of the Haynesville Shale boom, Hooper left IP and went to work at Empresa Energy LLC (“Empresa”). Hooper knew about IP’s extensive mineral *40 holdings and contacted Chesapeake to try to work out a deal between Chesapeake and IP. On June 19,- 2008, Empresa sent a letter of intent to IP. Although IP had a consulting contract with Hooper, it refused to work with him in this matter because he had recently been an employee. At IP’s insistence, Chesapeake dealt directly with IP. On June 20,2008, Chesapeake relayed the same letter of intent to IP. Chesapeake was under a time constraint to close this deal by June 30, 2008, so that it could include IJP’s acreage in a deal it had with Plains Exploration and Production Company (“PXP”). A letter of intent between Chesapeake and IP was signed on June 30, 2008. The final purchase and sale agreement, for nearly $263 million, was signed on July 24, 2008, in which Chesapeake bought a limited portion of the mineral rights in approximately 13,000 acres owned by IP. ' Empresa received a payment of $39 million from' Chesapeake for arranging the deal and Hooper was given a bonus of $3 million from Empresa.''
In the sale and purchase agreement, paragraph 1.1 defined the rights to be purchased and sold as follows (with boldface added for emphasis):
The “Assets” shall mean the following: all of Sellers’ right, title and interest in and to (a) the oil, gas and other minerals in, to and under the lands described in the attached Exhibit A, and any and all oil and gas leases covering such lands, INSOFAR AND ONLY INSOFAR as such oil, gas and other minerals are located below that depth which is the stratigraphic equivalent of the base of the Cotton Valley formation and the top of the Louark Group defined as correlative to a depth of 10,765’ in the Winchester Samuels 23 #1 well (API# 1703124064) located in Section 23-14N-13W, DeSoto Parish, LA, and correlative to a depth of 9,298’ in the Tenneco Baker # 1 well (API #1701320382) located in Section 12-"16N-10W, Bienville Parish, LA (such depths, the “Subject Depths”), including, but not limited to all rights to royalties on production, executive rights to lease, leasehold interests, overriding royalty interests and any and all other rights, permits or privileges relating to the ownership of such oil, gas and other mineral interests (collectively, the “Mineral Interests ”); (b) those agreements and contracts' relating to the Mineral Interests set forth on.the attached Exhibit B and (c) copies of all files, records and data (including electronic data, lease files, land files, abstracts, title files, maps, and other information), in each case in the possession of Sellers to the extent specifically related to such Mineral Interests and to the extent Sellers can transfer such data without the consent of a third party.[1]
At some point after the sale, IP transferred its mineral interests to BRP, a joint venture between ÍP and some of its subsidiaries. BRP considered selling more of its mineral rights and a dispute arose regarding the depth of minerals conveyed in the sale to Chesapeake. BRP claimed that IP intended to sell its mineral rights only in the Haynesville Shale and lower depths. BRP claimed its predecessor in interest, IP, retained all mineral interests above the top of the Louark Group. The Louark Group included only the Haynesville Shale and everything below it. Chesapeake *41 claimed that the agreement conveyed rights in the Bossier Shale, as well as the Haynesville Shale, even though arguably, the Bossier Shale lies above the Louark Group. In November 2010, BRP filed a petition for damages, declaratory judgment, and injunctive relief.[2]
BRP and Chesapeake each filed a motion for summary judgment claiming that the description contained in the sales contract was | ¿unambiguous and should be construed in the mover’s favor. After extensive briefing and lengthy oral arguments from both sides, the trial court denied both motions. The -trial court stated that “based on the facts and evidence presented I don’t think I could grant either one of the summary judgments at this time.”[3]
After many months of legal maneuvering and discovery, the trial court entered a scheduling order that bifurcated the trial. Phase I of the trial, the portion at issue in this appeal, concerned the interpretation of the instruments of conveyance and assignment from IP to Chesapeake. The only parties required to participate in Phase I were BRP, Chesapeake Royalty LLC, and MC Louisiana Minerals LLC. Defendants claiming to hold leases or lease extensions in the depths in dispute were allowed to participate in Phase I, but would be subject to the court’s determination in-Phase I. Those defendants who did not claim to hold title to the disputed depths under the leases or lease extensions from Chesapeake or MC Louisiana Minerals would not be prejudiced by the outcome of Phase I.[4] '
A bench trial in Phase I was held on March 24-26, 2014. Persons involved in the sale and several experts in geology testified. Numerous exhibits and depositions were introduced into evidence. The trial court | Bheard several days of testimony on the intent of the parties, as well as expert testimony explaining and construing the language used in the legal description. The admissibility of the parol evidence has, not been made an issue .on appeal.
David' Liebetreu, vice-president of global sourcing at IP, testified that Hooper had been the manager of IP’s oil and gas interests. Hooper had been with IP for more *42 than 20 years and knew the most about the company’s oil and gas holdings. IP had been selling assets and in 2008, when Hooper left the company to work for Empresa, he was not replaced.
Liebetreu said that in 2008, Hooper contacted him about IP selling some of its minerals. IP did not want to deal with Hooper or Empresa, so IP was contacted directly by Chesapeake. According to Liebetreu, the parties talked only about rights to the Haynesville Shale. However, Liebetreu acknowledged receiving an email and a letter of intent from George P. Denny, the business development land manager at Chesapeake, dated June 20, 2008, which stated:
Chesapeake Louisiana, L.P. (“Chesapeake”) hereby offers to purchase all of the rights owned by Sustainable Forest, LLC and Coval Leasing Company, LLC (jointly “IP”) below the Cotton Valley Formation (defined below) subject to the following terms and conditions!)]
The definition of the depths to be conveyed was identical to the language in the purchase and sale agreement set forth above. Liebetreu said he thought only the Haynesville Shale was below the Cotton Valley Formation, but he did not consult a geologist.'
|fiLiebetreu said that an agreement was reached over the phone by June 29, subject to approval by the IP board of directors at their meeting on July 8, 2008. A letter of intent was signed and the deal was ultimately approved by the IP board of directors.
Liebetreu said that IP had no part in drafting the language regarding the extent of the minerals conveyed. IP engaged Lazard Fréres & Co. (“Lazard”) to aid in valuing the transaction. Liebetreu thought Lazard would look at the description of what was being conveyed.
Thomas Connor, controller of land resources at IP from 2007-2010, testified that he helped put together information for Lazard to evaluate Chesapeake’s offer. He worked on a map, the deed, and the title information in this transaction to determine the number of mineral acres to be sold. He said his duties were financial and he is not a geologist. Connor did not know where the depth limitation language came from. According to Connor, the focus of the transaction was the Haynesville Shale.
A portion of the heavily redacted deposition of Robert Lynd, a vice-president with Lazard who specialized in oil and gas production, was admitted at trial. Lynd stated that Lazard is an advisor to other companies on mergers and acquisitions. IP asked Lazard to evaluate its mineral estate. Lynd reviewed the letter of intent from Chesapeake in this matter. He stated that the depth limitation language did not mean much to him because he is not a geologist. Lazard did not have a geologist examine the depth limitation language. He advised IP on the value of the Haynes-ville Shale and everything below it.
17Corbin Robertson, Jr., Chief Executive Officer (“CEO”) of Natural Resources Partners (“NRP”) and Quintana Energy Partners, also testified by deposition. He stated that NRP is a general partner of BRP. His companies were interested in acquiring the minerals that BRP still had, especially the Bossier Shale. Liebetreu told him he thought BRP still owned the rights to the Bossier Shale. Robertson said he looked at the language in the agreement between IP and Chesapeake and was confused about what IP had conveyed. Robertson had professionals evaluate the language and they were of the opinion that the depth markers represented by the two wells mentioned in the *43 agreement did not correlate with the top of the Louark Group.
Wendell Ralph Rice, an expert in geology, worked for Quintana and evaluated petroleum exploration projects that others brought to the company. He looked at the language in the agreement at issue here and concluded that the document defined four separate and distinct horizons. He stated that the two depth markers, represented by the two wells referenced in the agreement, absolutely do not correlate to each other or to the Cotton Valley Formation or the Louark Group.
Rice was asked about the Louisiana Geological Survey Folio Series showing that in some areas of Louisiana, the Bossier Shale extends into the Louark Group. He stated that sometimes geologists may disagree as to where different formations exist. He also stated that picking the two well depths listed in the agreement to locate the base of the Cotton Valley Formation was not a reasonable effort in his view.
| ^Ursula Hammes, who has a PhD in geology, is a research geologist with the University of Texas at Austin. She testified at trial as an expert in geology on behalf of BRP. She said that the base 'of the Cotton Valley Formation and the top of the Bossier Shale are the same line. According to Hammes, the well depths in the agreement are simply depths, and are not stratigraphic markers. She said stratigraphic markers included things like the bottom of the Cotton Valley Formation, the top of the Bossier, and the top of the Louark. The middle Bossier Shale, known as Bossier C, is the productive area of the Bossier Shale. However, the base of the Cotton Valley Formation and the top of the bouark Group are two different boundaries in the earth. They are separated by the Bossier Shale which is approximately 500-300 feet thick. The Bossier Shale is part of the Cotton Valley Group and the Haynesville Shale is in the Louark Group.
Hamlnes was asked whether the two wells described in the purchase and sale agreement correlated to each other. She defined “correlation” as trying to find specific markers in different well logs that match. She said the two wells referenced in the purchase and sale agreement could not be correlated. According to Hammes, the language in the agreement described four different points because the Cotton Valley Formation and the Louark Group do not touch and the two wells used for reference could not be correlated.
Hooper, vice-president of land and business development with Empresa, formerly worked at IP. and was responsible for bringing IP and Chesapeake together on this transaction. He stated that he is not a geologist hand he was not acting on behalf of IP in this matter. He knew that IP had producing wells in the Cotton Valley Formation and never intended to sell that interest. He enlisted the. aid of Empresa’s geologist, Johnny Dean, to draw up the language at issue here regarding what was to be conveyed in the sale. According to Hooper, the language conveyed all rights below the Cotton Valley Formation, including the Bossier Shale. Hooper said Empresa had used the same language in another transaction between Empresa and Chesapeake which was occurring at about the same time.
Dean, vice-president and chiéf geologist at Empresa, testified that he was approached by Hooper to draft the depth limitation language in the sale at issue here. He was asked to formulate a description that would convey everything below the base of the Cotton Valley Formation. He used the same depth limitation language that had been used in another transaction between Empresa and Chesapeake which occurred shortly before the *44 present sale. Deán stated that, in the prior transaction, the primary target was the Haynesville.Shale. The Bossier Shale was not a consideration at that time. He used the two wells listed in the agreement because they were the lowest producing Cotton Valley sand in the area of the acreage that was being sold. At the time he came up with the language, he considered those depths to be the bottom of the Cotton Valley Formation and the top of the Louark Group. When he came up with the language, Dean thought the Bossier Shale was in the Louark Group. He based this opinion on a stratigraphic chart he’ -had in his office which showed the Cotton Valley Formation to be at the top of the Louark "Group and which placed the Bossier Shale - in the Louark group. |inThis chart was introduced into evidence. Dean testified that his opinion has changed and now he would say that the Bossier Shale is not in the Louark Group, He said that today, if he were drafting a description of the rights to be conveyed, he would not use that language.
Excerpts of a deposition given by Chesapeake’s CEO, Aubrey McClendon, were introduced at trial. He stated-that Chesapeake was contacted by Hooper about the prospect of IP selling some mineral rights. He did not know who put the depth limitation language in the letter of intent and the purchase and sale agreement, but thought the language came from an assignment of a leasehold between Empresa and Chesapeake. McClendon stated that he was familiar with the Bossier Shale in 2008, and Chesapeake wanted all rights below the base of the Cotton-Valley Formation, especially the Bossier and Haynes-ville Shales. McClendon knew that the Bossier Shale is below the Cotton Valley Formation, but is .part of the Cotton Valley Group.
At the time of this transaction, John Sharp was employed at Chesapeake as geoscience manager for the Haynesville district. He was an overseer for the group identifying, prospects for Chesapeake, He testified that the Bossier Formation was below the Cotton Valley Formation and above ‘ the Haynesville Formation. The Bossier C Shale is the area considered the most viable in terms of production. In late 2007, the Bossier C was identified as an area .that Chesapeake wanted to pursue.
In June 2008, McClendon asked Sharp to make a geological - evaluation of the rights involved in this case. He was provided with a map |uand asked to evaluate various areas that had been shaded in. Sharp determined, that some of the areas had overlying Bossier potential. He suggested that Chesapeake get a firm grasp on depth limitations in the area in order to obtain Bossier Shale rights, as well as rights to the Haynesville Shale. He did not know if anyone at Chesapeake followed up on that suggestion.
According to Sharp, there are some areas of northwest Louisiana where the Bossier Formation is part of the Cotton Valley Group, and there are other areas where it is part of the Louark Group. He said that was the case, with some of the acreage involved here. Sharp explained that a group is one or more formations that have similar lithology. “Lithology” is the mineral composition of rock. The lithology is sandstone-dominated in the Cotton Valley Group and is shale-dominated in the Lo-uark Group. The composition of rock h the Bossier Formation changes such thrt, in certain areas of the state, it resemb'es the Cotton Valley Group and in other areas, it resembles the Louark Group.
Sharp was asked to evaluate whither the two wells used in the agreemen here correlate with each other. He sfid the *45 wells were stratigraphic equivalents and correlated to a position in the Bossier Shale. Sharp was questioned about the apparent discrepancy that the well depths did not define the base of the Cotton Valley Formation. Sharp said that his interpretation of the base of the Cotton Valley Formation may be different from that of another geologist. The exact points on the wells are 1 ^stratigraphic equivalents and that “is what carries the weight, because those do mean something from geologist to geologist.”
George P. Denny is manager of business development at Chesapeake. Much of his job focused on obtaining deep mineral rights below the Cotton Valley Formation. Denny was involved in negotiating the deal between IP and Chesapeake. He helped prepare the offer made to IP. In his deposition, Denny claimed that, in discussions with Liebetreu, he always said that Chesapeake was interested in buying IP’s mineral rights below the base of the Cotton Valley Formation. Denny said at the time, he did not know that the Bossier Formation existed.
Shawn Fields, vice-president of acquisitions and divestitures at Chesapeake, appeared at trial as Chesapeake’s corporate representative. In his testimony, he said that most contracts ' involving mineral rights use stratigraphic markers. Chesapeake’s intent in this case was to buy the rights below the base of the Cotton Valley Formation. He consulted with Sharp, who told him that the language in the agreement at issue here conveyed everything below the base of the Cotton Valley Formation. Fields reviewed the letter of intent and the purchase and sale agreement. The purchase and sale agreement was revised several times, but the language concerning the rights to be conveyed was never changed by IP or Chesapeake. Fields stated that the Bossier Shale rights were considered by Chesapeake in determining what to pay IP in this transaction.
Christopher Persellin, a geologist who worked for Chesapeake when this controversy arose, testified by deposition.- He was tasked with using | lswell .logs to prepare a cross-section showing the Cotton Valley and Bossier Formations, which are in the Cotton Valley Group, and the Lo-uark Group, which contains the Haynes-ville and Smackover Formations. He was instructed to use the two wells included in the depth limitation language of the purchase and sale agreement. He could not recall if he was asked to correlate the two wells. “Correlation” meant trying to find the same characteristics in two different wells and then naming the depths in which they occur. Persellin was asked in his deposition if the two wells could be correlated. , He said they could, because the characteristics of those two wells were the same.
Persellin said he used formation names, but not group names because groups are ambiguous. He stated that some geologists would consider the base of the Cotton Valley Formation and the top of the Lo-uark Group to be the same. However, he did not think the two wells could be used to define the base of the Cotton Valley Formation. Persellin said that depth limitation language is used because of the ambiguity regarding the location of formations. He -testified that he has no doubt that the Bossier C Shale falls below those two well depths.
Lewis Gilbert, an expert in geology, testified for. Chesapeake. He was asked to do three things in this case. First, he was to look at the points referenced in the two wells in the. depth limitation language and opine whether they were stratigraphically equivalent. Second, he was asked whether the boundary line included the Bossier Formation. Third, he was |14asked about *46 the importance ' of identifying geological formations in agreements by specific well depths, as opposed to using a formation name.
Gilbert determined that the two well depths did correlate and represented the same equivalent stratigraphic age rock. He stated that it is better to use stratigraphic equivalent points rather than formation names. He examined a cross-section of three wells, including the two wells used in the agreement here. He determined that the two wells create a stratigraphic horizon and the Bossier C Shale falls ■ below that horizon. Gilbert stated that a geologist would be able to look at the language in the agreement and know what was being conveyed; He acknowledged that some geologists previously thought the Bossier Shale went from the bottom of the Cotton Valley Formation to the top of the Smackover, but now, to the extent that the Bossier Shale has been identified, it is part of the Cotton Valley Group.
After hearing the testimony and considering the evidence, on June 12, 2014, the trial court filed written reasons for judgment in favor of Chesapeake. The court noted that, under the description of what was conveyed, the defendants argued that the limitation language is self-defining and the stratigraphic equivalent of the base of the Cotton Valley Formation and the top of the Louark Group is defined using specific correlative markers.
The court opined that IP’s main intent was to reserve the Cotton Valley Formation where there was ongoing production. The court noted that the'Haynesidlle Shale was the biggest concern for both parties in this deal and the Bossier Shale was not specifically addressed in correspondence liBor ■ negotiations. The court observed that IP was in a position to do as much due diligence as necessary to make sure all its concerns were addressed before signing the sale agreement, and the property description was in the agreement from the beginning.
. While the plaintiff argued that the depth of the two wells could not be correlated, the defendants’ expert testified they could. According to the court, the testimony and evidence shqwed that the two well depths are in the middle of the Bossier Shale Formation. The court observed that the Bossier C, the producing portion of that formation, is above the Haynesville Shale and below the lowest depths of either of the two described wells. The court found that the well depths in the purchase and sale agreement can be correlated to a degree suitable for the oil and gas industry, and the well depths should be given weight in interpretation of the descriptions of the zones in the sale. The court said that, if any ambiguities exist in the depth limitation language, the logical interpretation would be to use the lower correlative marker or the depth most beneficial to the defendants. The court stated:
The language describing the well depths cannot be ignored. They were in the description from the start of the negotiations and looked over by all parties involved. The depthfs] described in the wells are correlative enough to in-elude the Bossier C or paying portion of the Bossier Shale and thus the language of the agreement does not seem to be ambiguous. The well depth should be given weight in the interpretation of the sale agreement.
Based on the testimony and evidence, it is the ruling of this Court that the sale of the mineral interest sufficiently describes the minerals to be conveyed and thus judgment is in favor of the defendants, Chesapeake et al, and against the plaintiff, BRP.
*47 |1fiAfter extensive disagreement as to its form, a final judgment was signed by the trial court on March 23, 2015, approximately one year after trial. The judgment provided that Chesapeake acquired ownership of IP’s oil, gas and other minerals and any oil and gas leases or subleases below the stratigraphic equivalent of 10,765’ in the Winchester Samuels 23 #1 well (API# 1703124064) located in Section 23-14N-13W, DeSoto Parish, LA, and correlative to a depth of 9,298’ in the Tenneeo Baker # 1 well (API # 1701320382) located in Section 12-16N-10W, Bienville Parish, LA. In the event of conflict or to the extent the two stratigraphic markers do not correlate or form one line in the subsurface, Chesapeake acquired ownership in the depths stratigraphically below the deeper of the two stratigraphic markers. This was a partial judgment because other issues were bifurcated. It was certified as an appealable final judgment.
INTERPRETATION OF PURCHASE AND SALE AGREEMENT
Only BRP' has appealed, raising several assignments of error. It argues that the trial court erred in finding that the language of the purchase and sale agreement was unambiguous and in applying the wrong footage depths. BRP contends that the trial court erred in not applying the lowest geological boundary in the agreement to resolve the ambiguity. BRP urges that the trial court erred in finding that the intent of the parties was to convey everything below the Cotton Valley Formation.
|17Legal Principles
A contract is an agreement by two or moré parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906. Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045. This is true in the context of mineral exploration and rights, just as in other contexts. See Olympia Minerals, LLC v. HS Res., Inc., 2013-2637 (La.10/15/14), 171 So.3d 878; Ross v. Enervest Operating, L.L.C., 48,229 (La.App.2d Cir.6/26/13), 119 So.3d 943, writ denied, 2013-2034 (La.11/15/13), 125 So.3d 1110; Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co., 46,153 (La.App.2d Cir.3/23/11), 63 So.3d 159, writs denied, 2011-1225, 2011-1236 (La.9/23/11), 69 So.3d 1161, 1162.
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. La. C.C. art. 2046. The words of a contract must be given their generally prevailing meaning. Words of art and technical terms must be given their technical meaning when the contract involves a technical matter. La. C.C. art. 2047. Words-.susceptible of different meanings must be in-teipreted as having the meaning that best conforms to the object of the contract. La. C.C. art. 2048. A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective. La.' C.C. art. 2049.
Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a 118whole. La. C.C. art. 2050. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. C.C. art. 2053.
In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. La. C.C. art. 2056. In case of doubt that cannot be otherwise *48 resolved, a contract, must be interpreted against the obligee and in favor of the obligor of a particular obligation. Yet, if the doubt arises from lack of a necessary explanation that one party should have given, or from,negligence or fault of one party; the contract must be interpreted in a manner fayorable to the other party whether obligee or obligor. La. C.C. art. 2057.
Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract, unless the written expression of the common intention of the parties is ambiguous. Miller v. Miller, 44,163. (La.App.2d Cir.1/14/09), 1 So.3d 815. A contract is considered ambiguous on the issue of intent when either it lacks a provision. on that -issue, the terms of a written contract áre susceptible to more -than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed. Miller v. Miller, supra; Campbell v. Melton, 2001-2578 (La.5/14/02), 817 So.2d 69; Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co., supra. Whether a contract is ambiguous is a question of law. Miller v. Miller, supra; Hoover Tree Farm, L.L.C. v. Goodrich Petroleum Co., supra; Lawrence v. Terral Seed, Inc., 35,019 (La.App.2d Cir.9/26/01), 796 So.2d 115, writ denied, 2001-3134 (La.2/1/02), 808 So.2d 341.
Under Louisiana law, when there is any doubt about the meaning of an agreement, the court must ascertain the common intention of the parties, rather than adhering to the literal sense of the terms. The trial court’s initial inquiry should be whether the words of the contract clearly and explicitly set forth the intent of the parties. This methodology limits the interpretation of a contract to the internal.language of the contract itself. If this intent cannot be adequately discerned from the contract itself, the court may then consider evidence as to the facts and circumstances surrounding the parties at the time the contract was made. Miller v. Miller, supra. Determination of the intent of the parties becomes, in part, a question of fact. United Inv’rs Life Ins. Co. v. Alexander, 27,466 (La.App.2d Cir.11/1/95), 662 So.2d 831. See also Henry v. Ballard & Cordell Corp., 418 So.2d 1334 (La.1982).
In .the case of ambiguity in a contract, where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. Campbell v. Melton, 2001-2578 (La.5/14/02), 817 So.2d 69.
Discussion
According to BRP, the purchase and sale agreement contains ambiguous language regarding the depths conveyed to Chesapeake. BRP contends that the footage markers were erroneous. Because of this ambiguity, it urges that the proper interpretation of the agreement is to 12nconvey all minerals below the lowest depth listed, which is the top of the Lo-uark Group. It argues that the trial court erred in not applying the lowest geological boundary to resolve the ambiguity in the agreement.
The language of the agreement, set forth earlier, was drafted, not by Chesapeake or IP, but by an employee of Empresa, the company that initially brought the parties together. BRP claims that this description is ambiguous because the base of the Cotton Valley Formation and the top of the Louark Group are two different lines separated by several hundred feet of Bossier Shale. It also claims that the depths of the two wells in the description do not correlate to. each other *49 or to the bottom of the Cotton Valley Formation or the top of the Louark Group. According to BRP, the purchase and salé agreement lists four separate depth limitations that cannot be correlated. BRP states that the “conveyance 'specifies that the mineral rights conveyed are those lying below the stratigraphic equivalent of each of the four depth markers.” Therefore, BRP contends that the only way to give effect to all four depth references is to rule that the agreement conveyed, only those rights below the lowest of the four, the top of the Louark Group. However, an examination of the language in the agreement shows that it did not specify that rights were conveyed below the stratigraphic equivalent of each of the four mentioned locations. The language uses the well depths to define the bottom of the Cotton Valley Formation and the top of the Louark Group for purposes of this agreement.
While some experts testified that the bottom of the Cotton Valley Formation, the two well depths, and the top of the Louark Group form four L, separate lines in the earth, other evidence at trial disputed this theory. Even though there was discussion on the record showing that some geologists in the past thought the bottom of the Cotton Valley Formation and the top of the Louark Group were contiguous, the current thinking is that these formations are separated by the Bosr sier Shale. The evidence and testimony showed that the definitions of the location and composition of formations and groups may change over time and are subject to disagreement among geologists. Therefore, the usual procedure in the oil and gas industry is to use stratigraphic markers, such as those represented by the well depths used in this case, to provide certainty.
Further, while some of the experts for BRP testified that the two wells do not correlate to each other, other experts who testified for Chesapeake stated that they do correlate and are located in the same stratigraphic age rock. Testimony also showed that the two well depths create a stratigraphic horizon, and the Bossier C Shale falls below that horizon.
■ BRP argues that the rules governing surface limitations on servitudes'also apply to dividing mineral servitudes by depth. See Roemer v. Caplis, 369 So.2d 1186 (La.App.2d 1979), writ denied, 371 So.2d 620 (La.1979). It cites to this court jurisprudence dealing with boundary actions and surveys, noting that in those cases, the legal guides for determining the location of a boundary or line on the land, in the order of their importance and value, are: (1) natural monuments; (2) artificial monuments; (3) distances; (4) courses; and (5) quantity. See Meyer v. Comegys, 147 La. 851, 86 So. 307 (1920). BRP contends that natural monuments are given | ^.precedence because they are considered more permanent and possess fewer possibilities of error incident to courses, distances, and area. BRP urges that the “base of the Cotton Valley Formation” and the “top of the Louark Group” are such natural monuments. However, the expert testimony in this case shows that these formations and groups do not possess the permanence of natural monuments on the surface of the earth. The location of formations and groups are subject to disagreement , among geologists, and the general thought about their location can vary over time. As established on this record, for this reason, stratigraphic markers, such as the well depths used in this case, are the more commonly used in the oil and gas industry.
BRP also contends that the trial court erred in finding that the common intent of the parties was to convey all mineral *50 rights below the Cotton Valley Formation. BRP argues that all discussions between the parties and the reference lines of all emails connected with the transaction concerned the Haynesville Shale.
The trial court heard testimony that, at the time the agreement was confected, IP was mostly concerned with retaining its rights to the Cotton Valley Formation. Denny testified that, in negotiations with IP, Chesapeake offered to purchase mineral rights below the Cotton Valley Formation. The letter of intent from Chesapeake to IP specifies that the offer is for all mineral rights below the Cotton Valley Formation. It then specifically defines the rights to be conveyed to Chesapeake, using the exact language at issue here in the purchase and sale agreement. Although there was much discussion about the Haynesville Shale and, as stated by the trial court, this | ¡.¿¡was the main focus of the agreement, IP signed the letter of intent and was on notice that the purchase and sale concerned all rights below the Cotton Valley Formation. IP could have further examined the language in the agreement and could have asked that the agreement be limited to the Haynesville Shale, but it did not do so. IP/BRP’s concern regarding the ownership of the Bossier Shale arose much later, when a potential purchaser of those rights emerged.
As set forth above, the trial court heard extensive expert testimony regarding the meaning and construction of the depth language in the agreement at issue here. In order to determine the intent of the parties in making this agreement and in construing the language of the contract, the court was required to make some credibility and factual determinations. In all civil cases, the appropriate standard for appellate review of factual determinations is the manifest error-clearly wrong standard, which precludes the setting aside of a trial court’s finding of fact unless that finding is clearly wrong in light of the record reviewed in its entirety. Under a proper manifest error review, the analysis by the reviewing court should focus on whether there was clear error for lack of a reasonable basis in the conclusions of the factfinder. Rarely should a district court’s choice of experts be found clearly wrong because it is so difficult to find a reasonable basis does not exist for the expert’s opinion relied upon by the district court. It is destructive to the manifest error analysis for a reviewing court to make its choice of the evidence, rather than look for clear error in the reasonable basis found by the trier of fact. Hayes Fund for First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC, 2014-2592 (La.12/8/15), 193 So.3d 1110.
While the trial court stated in its reasons for judgment there was no ambiguity in the agreement, the trial court heard several days of testimony on the intent of the parties, as well as expert testimony construing the language of the agreement. The admissibility of the extrinsic evidence considered by the court is not an issue on appeal. To a layperson, the language in the agreement appears to be somewhat ambiguous on its face. However, the expert testimony provided guidance to the court in understanding the technical language contained in the agreement and customs in the industry. After considering the testimony and evidence presented at trial, we find that the trial court did not err in applying the stratigraphic markers represented by the well depths as the boundary line for the mineral rights conveyed. The expert testimony presented by Chesapeake supports this interpretation.
We also' note that there was ample evidence in the record that, at the time this agreement was executed, IP was con *51 cerned with preserving its rights to the Cotton Valley Formation. It was receiving substantial revenue from this formation and wanted to retain the revenue and mineral rights. The letter of intent, signed by the parties, clearly states that the mineral rights to be conveyed fall below the Cotton Valley Formation.
Accordingly, we find that the trial court did not err in its decision regarding the intent of the parties to this agreement or in its construction of l^the wording of the agreement to determine the extent of the mineral rights conveyed.
CONCLUSION
For the reasons stated above, we affirm the decision of the trial court in favor of the defendants, Chesapeake Royalty LLC, MC Louisiana Minerals LLC, Chesapeake Louisiana LP, PXP Louisiana LLC, PXP Louisiana-Operations LLC, Empresa Energy LLC, and Empress LLC, and against the plaintiff, BRP LLC. Costs in this court are assessed to BRP.
AFFIRMED.
BLEICH, J. (Ad Hoc), concurs with written reasons.

. For clarity, a graph is attached as an appendix to this opinion. The graph was introduced into evidence and shows the location of the geological formations, groups, and the well depths discussed in this opinion. The graph was prepared by Christopher Persellin, a geologist for Chesapeake, after the dispute arose in this matter. His testimony will be set forth below.

.Named as defendants were Chesapeake Royalty LLC, MC Louisiana Minerals LLC, Chesapeake Louisiana LP,, PXP Louisiana LLC, PXP Louisiana Operations LLC, Empre-sa Energy LLC, Empress LLC, and Encana Oil & Gas (USA), Inc. The plaintiff later added SWEPI LP as a defendant. SWEPI assumed the position of plaintiff in concursus and added ForestLand Partners, Ivory Acquisition Partners LP, and Ivory Working Interests as defendants in concursus. This con-sursus proceeding has been stayed pending decision of the matters at issue here. Blackstone Minerals Company LP is the surviving entity of the merger of Ivory Acquisitions and Ivory Working Interests. According to BRP, Chesapeake Royalty and MC Louisiana wrongfully received mineral royalties and other income from operations in the depths BRP claims it retained. The other companies purportedly acquired leases affecting the retained depths and have claimed rights to drill and develop the retained depths, including the Bossier Shale.

. At the hearing on the motions for summary judgment, both sides claimed the language at issue was unambiguous and the issue could be decided from the four corners of the instrument. Counsel for one party argued that the case was "very simple.” Interestingly, after much discovery and a trial in the court below, this “simple” matter has generated what one attorney at oral argument before us termed a "robust record.”

. Phase II of the trial, which has not yet occurred, will concern all matters remaining before the court, including the allocation of mineral production by operators of wells which are produced from the depths in dispute, dependent on the outcome of Phase I. Phase II was stayed pending further orders of the court.