Judgment rendered February 5, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 53,205-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

BILLY AND EDNA FOSTER                    Plaintiffs-Appellants

versus

ADRIAN FISHER, LATONDRA                  Defendants-Appellees
FISHER, AND COGNITIVE
DEVELOPMENT OF MONROE,
INC.

* * * * *

Appealed from the
Fourth Judicial District Court for the
Parish of Ouachita, Louisiana
Trial Court No. 2006-3488

Honorable Marcus Lamar Hunter, Judge

* * * * *

ROUNTREE LAW OFFICES                     Counsel for Appellants,
By: James A. Rountree                    Billy and Edna Foster
    Michael G. Renneisen


BREITHAUPT, DUBOS & WOLLESON             Counsel for Appellees
By: Robert Alan Breithaupt              Adrian Fisher, LaTondra
    Michael Lee DuBos                    Fisher, and Cognitive
    James R. Close                       Development of Monroe,
    K. Lamar Walters III                 Inc.


PIERRE & PIERRE, L.L.C.                   Counsel for Appellee
By: James Rodney Pierre                  The Macro Group, L.L.C.


* * * * *

Before STONE, COX, and STEPHENS, JJ.

**STEPHENS, J.**

Plaintiffs, Billy and Edna Foster, husband and wife, appeal a judgment of the Fourth Judicial District Court, Parish of Ouachita, State of Louisiana, in favor of defendants, Adrian and LaTondra Fisher, husband and wife, and Cognitive Development Center of Monroe, Inc., dismissing plaintiffs' claims with prejudice. Defendants answered and appeal the denial of their exceptions of peremption and prescription and counterclaims against plaintiffs. For the following reasons, we affirm in part and reverse in part the trial court's judgment.

## FACTS AND PROCEDURAL HISTORY

This matter arises out of Billy Foster's and Adrian Fisher's corporate ownership in Cognitive Development Center of Monroe, Inc. ("CDCMI"), which was formed in 2003 with third owner, Kerry Scott. According to CDCMI's articles of incorporation, each owner was subscribed 33⅓ shares. CDCMI began as a mental health rehabilitation service and expanded in 2005 to include personal care attendant services. Kerry left CDCMI in 2004 to form another company. Both Billy and Adrian testified their families once had a close personal relationship, which included Billy serving as a father figure and mentor to Adrian. However, discord between the two men developed regarding the management and finances of CDCMI and its two distinct areas of practice—mental health rehabilitation services and personal care attendant services. Tension culminated at a meeting on or about Friday, June 16, 2006. The following week, Billy, who typically opened the CDCMI office for business each day, arrived to find the office locks had been changed. Billy neither performed further work nor provided further services for CDCMI after this date. Six weeks later, defendants filed an

amended articles of incorporation for CDCMI, removing Billy as a shareholder.

Plaintiffs filed a petition for damages on August 11, 2006, seeking recognition of Billy's ownership of 50% of CDCMI, damages for breach of fiduciary duty, and liquidation of the corporation under the supervision of the court. Extensive litigation ensued, including multiple motions, hearings, supplemental and amended petitions, reconventional demands, and answers. Notably, plaintiffs amended their petition to claim damages for unfair trade practices and racketeering, while defendants reconvened with claims for breach of contract in bad faith, racketeering, unfair trade practices, detrimental reliance, unjust enrichment, and breach of fiduciary duty. The trial on the merits finally began in January 2015, and continued over several days throughout the year into 2016. After the close of evidence, the trial court denied defendants' exception of prescription as to plaintiffs' racketeering claims, finding the motion was moot upon its determination that there was no criminal act or intent on the part of defendants. The trial court never ruled on an exception of peremption filed by defendants in relation to plaintiffs' unfair trade practices.

On August 18, 2017, the trial court issued its final oral ruling, finding Billy effectively quit CDCMI in June 2006, and Adrian owed Billy compensation for his share of the value of the business as of that date. The trial court appointed an expert witness to aid the court in determining the value of CDCMI as of June 20, 2006, based on the evidence adduced in the case. Defendants objected to the trial court's ruling at the time, and plaintiffs ultimately sought supervisory review by this court, requesting the trial court be directed to render a final judgment. Plaintiffs' writ was

2

granted and remanded with instruction. *Foster v. Fisher*, 51,927-CW (La. App. 2 Cir. 12/1/17). The writ order stated in part, "Since the parties rested their case and submitted this matter to the judge for decision, and because the parties object to the reopening of evidence by the appointment of an expert, this court grants the writ." It was further ordered that the "matter be submitted for decision on the evidence tendered by the parties at the trial on the merits." Following the writ order, the trial court judge who had presided over the trial subsequently retired without rendering a final judgment.

The new trial court judge assigned to the case filed written reasons for judgment on January 19, 2019, in which he noted the findings of fact and reasons for judgment issued orally by the prior trial court judge. The trial court determined the previous ruling of the court was that plaintiffs were entitled to 50% of the value of CDCMI on or about June 2006, and all other claims and causes of actions asserted by plaintiffs as well as claims by the defendants in their reconventional demand were either explicitly or implicitly denied. Accordingly, the trial court issued the following ruling:

> Therefore, in accordance with the Second Circuit's instructions, this court has reviewed the record with an eye toward making a finding as to the value of CDCMI in June 2006. The court finds there was no evidence offered at trial with which to make such a determination. Since the burden of proof as to the element of damages rests with plaintiffs, the court is constrained to find plaintiffs have failed to meet their burden. For this reason, no damages will be awarded herein.

Final judgment denying all claims of both plaintiffs and defendants was signed by the trial court and filed on February 7, 2019. This appeal by plaintiffs ensued followed by an answer filed by defendants.

## DISCUSSION

### *Ownership of CDCMI*

Plaintiffs assert in an assignment of error that the trial court erred by ignoring Billy's ownership of CDCMI and his right to the profits which have been attributable to his interest since 2006. First, plaintiffs claim Billy still owns 50% of the company because there is no legal way his ownership interest could be divested without his affirmative act. We agree.

A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906. Contracts have the effect of law for the parties. La. C.C. art. 1983. Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045; *BRP LLC (Delaware) v. MC Louisiana Minerals LLC*, 50,549 (La. App. 2 Cir. 5/18/16), 196 So. 3d 37. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046; *BRP LLC (Delaware), supra*. Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract, unless the written expression of the common intention of the parties is ambiguous. *BRP LLC (Delaware), supra*.

The evidence presented at trial showed Billy's ownership shares were not sold, donated, or otherwise transferred in compliance with corporate documents. In 2005, CDCMI filed amended articles of incorporation (the "2005 Amended Articles") to reflect Kerry's departure from the company. Article IX provides 50 shares of stock were subscribed to each LaTondra McCoy Fisher and Billy Foster. Article X of the 2005 Amended Articles governs the terms for the transfer of stock. Article XV of the 2005

4

Amended Articles governs the terms for amending the articles and provides in pertinent part:

> Changes in the rights of holders of shares of any class shall be made by a majority vote or written consent of the shareholders given voting power by these articles; and in addition, by a majority vote or written consent of the class or classes of shareholders affected, whether they are otherwise entitled to vote or not.

However, on July 27, 2006, subsequent amended articles of incorporation of CDCMI were filed with the Louisiana Secretary of State (the "2006 Amended Articles"). Article IX of these articles provides the subscription of shares as follows: Adrian Fisher, 49 shares, and LaTondra McCoy Fisher, 51 shares. It is undisputed that Billy, a 50% shareholder pursuant to the 2005 Amended Articles, never voted or gave written consent to reduce his ownership interest or remove himself from CDCMI, regardless of the ownership interest articulated in the 2006 Amended Articles.

Nonetheless, defendants argue the 2006 Amended Articles accurately reflect the current ownership of CDCMI. They claim that by virtue of an oral pre-incorporation agreement, Billy's ownership in CDCMI ceased in June 2006 when he refused to return to work or perform services for CDCMI. They assert this oral agreement must be considered in conjunction with the "Corporate Business Agreement" (the "CBA") the parties entered into when forming CDCMI. Adrian and Kerry both testified they, together with Billy, reached a verbal agreement in August 2003 that ownership in CDCMI would be conditioned on the performance of allocated duties, *i.e.* those enumerated in the CBA. In support of this assertion, defendants point to the essential disappearance of Kerry's ⅓ ownership interest in CDCMI. The testimonial and documentary evidence confirm there was no offer or

conveyance of Kerry's ownership interest to Billy or CDCMI preceding the 2005 Amended Articles. However, both Billy and Adrian testified that upon Kerry's departure from the company, CDCMI assisted Kerry in starting his new company by giving him clientele, staff money, and paying his expenses for several months. Defendants further assert the terms of the CBA itself condition continued ownership on continued performance. Adrian testified at trial the articles of incorporation was simply a document used to organize the corporation to operate in Louisiana and it was, instead, the CBA that dictated the operation of CDCMI.

The CBA provides as follows in the paragraph entitled "Explanatory Statement":

> This document represents the [CDCMI] The following parties each shall own 33⅓% of Cognitive Development: (1) Adrian Fisher, (2) Billy Foster, (3) Kerry Scott. Now, therefore, in consideration of their mutual covenants and promises, the parties agree as follows: Profits and Expenses shall be divided at 33⅓% amongst the owners of [CDCMI].

The language in the Explanatory Statement clearly and unambiguously states that the parties' agreement regarding division of "profits and expenses," ***not ownership***, was made in consideration of the mutual covenants and promises. The CBA then proceeds to articulate the specific mutual covenants and promises of the parties, wherein Article V lists duties for each of the original incorporators: Adrian, Billy, and Kerry. The CBA addresses ownership in Article VI, which provides: "Neither the incorporators of this business or any subsequent owners thereof shall sale [sell] any ownership interest in [CDCMI] without first offering said ownership to the owners herein." Notably, this provision does not conflict

6

with Article X of the 2005 Amended Articles governing the terms for the transfer of stock.

In its oral reasons, the trial court specifically found Billy's ownership in CDCMI did not cease after Billy's "breach of the CBA" in June 2006. We agree. The words of both the 2005 Amended Articles and the CBA are clear and explicit, and the intent of the parties regarding the transfer of ownership or stock is unambiguous. Any parol evidence in the form of testimony offered by the defendants about an oral pre-incorporation agreement regarding the forfeiture of ownership would vary the terms of these documents and is, therefore, precluded from consideration. *See BRP LLC (Delaware), supra.* Likewise, we find Billy's ownership in CDCMI did not cease by virtue of the 2006 Amended Articles, which unilaterally and without the authority required by the previous articles removed Billy as a shareholder of CDCMI. Accordingly, the trial court erred. Plaintiffs' claim has merit—Billy continues to be a 50% shareholder of CDCMI.

*Profits of CDCMI*

In connection with this assignment of error, plaintiffs additionally argue that by virtue of his continued ownership in CDCMI, Billy is entitled to 50% of CDCMI's net profits from the year 2006 to present. We disagree. The articles of the CBA clearly encompass the mutual covenants and promises among the parties, including agreements regarding the parties' work capacity, reimbursement to Adrian for his initial investment in CDCMI, company-provided life insurance, and most notably, as found in Article V, the individual duties of each incorporator. The "Explanatory Statement" of the CBA is likewise clear that profits are to be divided amongst the owners "in consideration of their mutual covenants and

7

promises." Therefore, the CBA unequivocally allocates profits in consideration for the performance of duties, not by virtue of mere passive ownership. This design does not conflict with the 2005 Amended Articles, which other than the subscription of shares, is silent as to the terms of distribution of profits to shareholders.

Article V (5.2) of the CBA, entitled "Billy Foster Duties," provides:

Billy Foster shall have the following duties:

1. Provide ongoing clinical direction, oversight and coordination of services for all Clinical Managers in the mental health services;

2. Provide ongoing training assistance/training for all clinical managers;

3. Provide monthly supervision for all licensed individuals who are providing clinical direction;

4. Staff continuous problematic cases and employee with Clinical Managers;

5. Direct marketing services to recruit consumers;

6. Participate in economic development for Cognitive Development Center;

7. Review all quarterlies and reports by licensed professionals;

8. Coordinate all marketing meeting with referral sources;

9. Provide monthly marketing report i.e. verbally or written to office personnel for written report to the management team;

10. Monitor the mix of services;

11. Provide additional services as recommended by the management team;

12. Report to the management team of Cognitive Development Center.

The CBA clearly provides Billy is entitled to profits only commensurate with his performance. Billy did not perform any of the enumerated duties

8

for CDCMI after June 2006. Accordingly, Billy's right to the profits of CDCMI ceased in June 2006, when he stopped providing services to CDCMI in accordance with the Article V (5.2) of the 2005 Amended Articles.

However, plaintiffs submit Billy's dereliction was not by choice. Specifically, they argue his performance of the duties was prevented by his literally being locked out of CDCMI and the overall hostility Adrian exhibited toward him. Adrian testified the locks were changed due to the dismissal of a disgruntled employee, not to keep Billy out. He further testified that after Billy stopped coming to work, he made multiple attempts to contact Billy by both phone and written correspondence, but Billy refused to respond. In fact, Billy specifically testified he could have returned to work and continued performance of his duties but elected not to. Edna testified she continued to go to work at CDCMI until her resignation in August 2006. Furthermore, prior to the supposed "lockout," Billy was already in the process of creating another company—Another Chance Enterprises, Inc. ("ACE"), a personal care attendant services and a day rehabilitation program. As discussed above, Billy committed no act and gave no consent to divest himself of ownership in CDCMI. However, his actions clearly indicate his intent to be no longer employed at CDCMI or to perform the duties required of him by the CBA after June 2006. Therefore, we find Billy willingly forfeited his rights to any profits (and responsibility for any expenses) after that time.

Plaintiffs also assert in this assignment of error that by virtue of Billy's continued right to a portion of CDCMI's profits, he is additionally entitled to those profits generated by Cognitive Development Center of

Monroe Personal Care Services, Inc. ("PCS"), which was formed by defendants in June 2006, following Billy's departure from CDCMI. For the reasons stated above regarding Billy's right to 50% of CDCMI's profits since 2006, this argument is without merit.

*Liquidation of CDCMI*

In another assignment of error, plaintiffs assert the trial court erred by ignoring defendants' gross and persistent *ultra vires* acts justifying the appointment of a receiver and a liquidator. Based on the facts discussed above and our determination that Billy is still a 50% shareholder in CDCMI, we agree with plaintiffs that CDCMI should be liquidated.

The law regarding involuntary proceedings for dissolution at the time this suit was instituted was found in La. R.S. 12:143 (repealed 2015), which provided in pertinent part:

> A. The court may entertain a proceeding for involuntary dissolution under its supervision when it is made to appear that:
> . . .
> (4) The directors are deadlocked in the management of the corporate affairs, and the shareholders are unable to break the deadlock; or
> . . .
> (5) The shareholders are deadlocked in voting power, and have failed, for a period which includes at least two consecutive annual meeting dates, to elect successors to directors whose terms have expired or would have expired upon the election of their successors, but only if irreparable injury to the corporation is being suffered or is threatened by reason thereof, or if irreparable injury to the shareholders is being suffered or is threatened by reason thereof and the court shall determine that such irreparable injury warrants dissolution after giving due regard to the interests of the other shareholders, the employees, and the public; or
> . . .
> (7) The corporation has been guilty of gross and persistent ultra vires acts[.]

While Louisiana's statutory grounds for the relatively drastic remedy of judicial dissolution of a domestic corporation are limited and specific, the

legislature intended that the words "*ultra vires*" as used in Section A(7) be given a fairly broad application. *Gooding v. Millet*, 430 So. 2d 742 (La. App. 5 Cir. 1983). In *Gooding*, *supra*, the court found borrowing funds from a bank and mortgaging company assets without proper corporate authorization, and the payment of a salary to a person not employed by the corporation, amounted to *ultra vires* acts in the narrow sense.

Here, defendants unequivocally exceeded their authority and legal power and committed *ultra vires* acts when they filed the 2006 Amended Articles without adhering to the provisions of Articles X and XV of the 2005 Amended Articles, which pertain to the transfer of stock and amendment of the articles of incorporation. Furthermore, considering our above determination that Billy and LaTondra each remain 50% shareholders of CDCMI, we find the shareholders of CDCMI are clearly deadlocked—an enumerated cause for liquidation. We recognize involuntary dissolution is permissible rather than mandatory. However, we also recognize the parties' disagreement regarding corporate affairs is so extensive that they have been opponents in litigation concerning the corporation for 13 years. Multiple, serious accusations were made by the parties, with both Billy and Adrian testifying regarding the general lack of trust they have for one another. The massive record generated by this litigation clearly establishes the relationship between the shareholders is irreparable and CDCMI cannot operate in a manner advantageous to both of them. Accordingly, the trial court was in error by failing to liquidate CDCMI. The trial court, in accordance with this decision, shall have the discretion to make the necessary appointments to facilitate dissolution of CDCMI in accordance with the law.

11

*Breach of Fiduciary Duty and Unfair Trade Practices*

Plaintiffs assert in another assignment of error that the trial court erred in ignoring defendants' breach of fiduciary duty to CDCMI and Billy, which breach was so persistent and egregious that it amounted to an unfair trade practice. Plaintiffs concede they did not use the words "unfair trade practices" in their petition, but claim the facts constituting unfair trade practices were sufficiently pled. Specifically, plaintiffs allege defendants' formation of PCS to divert business from CDCMI was a blatant breach of fiduciary duty that amounted to theft for which Billy is entitled to damages. Similarly, defendants, in their answer to appeal, assert the trial court erred in denying their counterclaim alleging Billy breached his fiduciary duty to defendants. They argue Billy breached his fiduciary duty when he formed ACE, recruited CDCMI employees and clients to work at ACE and operated ACE in direct competition with CDCMI. Defendants likewise assert the breach of fiduciary duty alleged constitutes an unfair trade practice.

According to the applicable law in effect at the time, officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders. La. R.S. 12:91(A) (repealed 2015). In order to establish a claim for breach of fiduciary duty, plaintiffs had the burden of proving gross negligence or intentional tortious conduct or intentional breach. La. R.S. 12:91 (repealed 2015).

The Louisiana Unfair Trade Practices Act ("LUTPA") is set forth in La. R.S. 51:1401, *et seq.* Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. La. R.S. 51:1405(A). Acts constituting unfair or deceptive trade practices are not specifically defined in LUTPA, but are determined by the

courts on a case-by-case basis. *Cheramie Services, Inc. v. Shell Deepwater Prod., Inc.*, 2009-1633 (La. 4/23/10), 35 So. 3d 1053. In general, acts which comprise unfair trade practices involve fraud, deception, misrepresentation, breach of fiduciary duty, or other unethical conduct. *Walker v. Hixson Autoplex of Monroe, L.L.C.*, 51,758 (La. App. 2 Cir. 11/29/17), 245 So. 3d 1088. To succeed on a LUTPA claim, the plaintiff must show the alleged conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious. *Id.* The span of prohibited practices under LUTPA is extremely narrow. *Cheramie*, *supra*; *Walker*, *supra*.

Whether a defendant has violated LUTPA is a factual determination. *Walker*, *supra*. An appellate court may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. *Id.* Where there is more than one allowable view of the evidence, the fact finder's choice among them cannot be manifestly erroneous or clearly wrong. *Id.* Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. *Cole v. Department of Public Safety & Corr.*, 2001-2123 (La. 9/04/02), 825 So. 2d 1134.

Here, there are factors that mitigate the alleged unscrupulous actions of the parties. Notably, Adrian formed PCS *after* Billy discontinued performance of his duties at CDCMI. Adrian's testimony established his belief—albeit erroneous, as we established above—that Billy's failure to perform his obligations under the CBA divested him not only of the right to the distribution of profits from CDCMI, but also of any ownership in

13

CDCMI. This eliminated, in Adrian's mind, any fiduciary duty he owed to Billy after June 2006. In contrast, Billy began forming ACE while he was still actively working for CDCMI. Billy notably testified ACE was originally intended to be a basic social service agency, not a mental health rehabilitation agency, and would, therefore, not be in direct competition with CDCMI. He also testified Adrian was aware of his formation of ACE and did not voice an objection, whereas Adrian testified he was not aware of Billy's formation of ACE. However, Adrian testified there was no prohibition against Billy performing work outside of CDCMI and stated he had been aware and had no objection to the sex offender rehabilitation work Billy performed on the side, for which Billy permissibly used CDCMI's resources and facility.

Considering the totality of the circumstances, the actions of either party simply do not arise to the egregiously fraudulent, immoral, or substantially injurious level required to prevail on a claim for unfair trade practices. Furthermore, to the extent the actions alleged by each party amounted to an intentional breach of fiduciary duty, this breach was committed by both parties. The trial court heard extensive testimony regarding CDCMI, PCS, and ACE, yet declined to award either party damages for breach of fiduciary duty or LUTPA violations arising out of the formation or conduct of these three entities. We cannot say that decision was manifestly erroneous or clearly wrong. Accordingly, the assignments of error by both parties regarding damages for the breach of fiduciary duty and unfair trade practices are without merit.[1]

_____

[1] In further answering, defendants assert the trial court erred in failing to grant their exception of peremption. They argue plaintiffs' unfair trade practices claims are

14

*Racketeering*

In an additional assignment of error, plaintiffs assert the trial court erred by ignoring the pattern of racketeering activities through which defendants acquired an interest in and operated CDCMI. They claim defendants' racketeering activity includes theft, filing false public records, and money laundering, and argue they are, therefore, entitled to recover three times actual damages and reasonable attorney fees. We disagree.

The Louisiana Racketeering Act is set forth in La. R.S. 15:1351, *et seq.* Louisiana R.S. 15:1352 provides, in part:

> A. As used in this Chapter, "racketeering activity" means committing, attempting to commit, conspiring to commit, or soliciting, coercing, or intimidating another person to commit any crime that is punishable under the following provisions of Title 14 of the Louisiana Revised Statutes of 1950, the Uniform Controlled Dangerous Substances Law, or the Louisiana Securities Law:
> . . .
> (10) R.S. 14:67 (Theft)
> . . .
> (17) R.S. 14:230 (Money laundering)
> . . .
> (38) R.S. 14:133 (Filing or maintaining false public records)

Any person injured by a pattern of racketeering shall have a cause of action against any person who violates La. R.S. 15:1535, which provides in pertinent part: "B. It is unlawful for any person, through a pattern of racketeering activity, knowingly to acquire or maintain, directly or indirectly, any interest in or control of any enterprise or immovable property."

---

perempted because they did not assert the claim in their August 2007 petition but, instead, first made the claim seven years later in their amended petition. In light of the above determination regarding the plaintiffs' LUTPA claims, this assignment of error is pretermitted.

Here, each of the crimes constituting racketeering activity which plaintiffs allege were committed by defendants have a required element of criminal intent. As discussed above, the extent of any misconduct by defendants could be characterized as a breach of fiduciary duty and *ultra vires* acts. However, in order to prevail on their civil racketeering claim, plaintiffs had the additional burden of proving defendants' underlying criminal intent. The record establishes Adrian's belief that Billy's ownership in CDCMI ceased when he discontinued performance of his duties. It further shows Adrian attempted to facilitate an amenable parting between the parties. Adrian sent Billy a letter, dated August 4, 2006 (the "August 4 letter"), in which Adrian notes Billy's refusal to return his calls and "formally invite[s]" Billy to a meeting with a CPA to "discuss the financial position and net worth of Cognitive Development Center of Monroe as of June 30, 2006 . . . to determine what you and I are due from the assets of the company." Plaintiffs offered no evidence proving the contrary—that Adrian, instead, acted with the underlying criminal purpose of stealing Billy's ownership interest in CDCMI from him. Thus, plaintiffs failed to establish any criminal intent. We therefore cannot find the trial court was clearly wrong in declining to award plaintiffs damages for a pattern of racketeering activity committed by defendants. Accordingly, this assignment of error is without merit.[2]

---

[2] Defendants assert in their answer that plaintiffs' racketeering claim is prescribed because neither the claim nor allegations of the purported predicate acts were made until more than seven years after the original petition, surpassing the five-year prescriptive period. In light of the above determination regarding the plaintiffs' racketeering claim, this assignment of error is pretermitted.

16

*Mental Anguish, Pain, and Suffering*

In their final assignment of error, plaintiffs assert the trial court erred by ignoring their mental anguish, pain, and suffering. They claim Adrian intentionally inflicted pain upon them as "part of his scheme to take everything and bring them to their knees so they would accept a fraction of their damages to survive."

The basis for the tort of intentional infliction of emotional distress is La. C.C. art. 2315. In order to recover for intentional infliction of emotional distress, a plaintiff must establish that (1) the conduct of the defendant was extreme and outrageous; (2) the emotional distress suffered by the plaintiff was severe; and (3) the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct. *White v. Monsanto Co.,* 585 So. 2d 1205, 1209 (La. 1991). Louisiana courts have staunchly adhered to the standard established in *White*, *supra. LaBove v. Raftery*, 2000-1394 (La. 11/28/01), p. 17, 802 So. 2d 566, 578. This court subsequently elaborated on the applicable standard for the first element:

> It is not enough that the defendant acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and leave him to exclaim, "Outrageous." (Citations omitted.)

*Fletcher v. Wendelta, Inc.,* 43,866 (La. App. 2 Cir. 1/14/09), 999 So. 2d 1223, *writ denied*, 2009-0387 (La. 4/13/09), 5 So. 3d 164.

Here, plaintiffs allege the following acts committed by defendants caused them severe emotional distress: depriving Billy of his 50% ownership of CDCMI; restricting Billy's access to the office and bank accounts; turning the staff against Billy, terminating the CDCMI-subsidized health insurance plan that covered plaintiffs and their two children; and, taking Billy's company car. Applying the standard in *White,* we find the record simply does not support plaintiffs' recovery for the intentional infliction of emotional distress. While the tumultuous business dealings and relationships between the parties was undoubtedly distressing at times, the defendants' alleged conduct was far from so extreme and outrageous as to prove that defendants intended their conduct to bring about severe emotional distress or should have realized their conduct would do so. Notably, in the August 4 letter, Adrian specifically invited Billy to discuss Billy's company car, healthcare coverage, life insurance, and Billy's personal belongings at the office. Billy refused to attend the meeting and instead filed this lawsuit a week later. Plaintiffs also failed to prove any specific emotional distress—the record is devoid of any evidence that either Billy or Edna had to seek treatment for stress, anxiety, or mental anguish caused by any action by defendants. Accordingly, this assignment of error is without merit.

## CONCLUSION

For the foregoing reasons, we reverse that portion of the judgment refusing to recognize Billy Foster as a 50% owner of Cognitive Development Center of Monroe, Inc. We also reverse that portion of the judgment refusing to liquidate CDCMI. All other portions of the trial court's judgment are affirmed. The matter is remanded to the trial court for further proceedings in accordance with this opinion. Costs of appeal are

18

assessed one-half to Billy Foster and Edna Foster and one-half to Adrian

Fisher, LaTondra Fisher, and Cognitive Development Center of Monroe,

Inc.

**REVERSED IN PART; AFFIRMED IN PART; REMANDED FOR FURTHER PROCEEDINGS.**