WILLIAMS, J.
|, The plaintiff, Ray Fancher, appeals a judgment awarding him $12,463.74 as the value of his share of a limited liability company. The trial court found that the fair market value of Fancher’s interest was best determined by using the book value of the company’s assets. For the following reasons, we affirm.
FACTS
In March 2008, William Cody Robbins filed articles of organization forming Diamond Shield Services, LLC (“Diamond Shield”), a limited liability company with a stated term of 50 years. In April 2008, Steven Prudhome and Ray Fancher became members of Diamond Shield, with each acquiring a one-third interest in the company. Robbins retained a one-third interest and served as the managing member. As consideration for his interest, Fancher agreed to pay ten dollars and provide work and capital for the company. In June 2008, Fancher loaned $15,000 to Diamond Shield for payroll expenses.
At the time of Diamond Shield’s creation, Fancher was employed as a consultant by Bowman’s Oilfield Services, LLC, through which he performed consulting services for NFR Energy. Fancher then directed the business of NFR Energy to Diamond Shield. NFR Energy became the primary source of business for Diamond Shield.
To obtain additional capital for operating expenses, Robbins and Prudhome entered into a loan agreement with One Smart Tool (“OST”). From July to September 2008, OST loaned or advanced approximately $400,000 to Diamond Shield. The terms of the loan required Diamond | gShield to pay 50% of its gross profits to OST. The loan agreement did not list Fancher as a member of Diamond Shield, nor did Robbins and Prudhome advise Fancher about the loan. After the OST loan, Diamond Shield operated profitably. From April 2008 to April 2009, Fancher received $130,000 in disbursements from Diamond Shield. Robbins and Prudhome managed the daily operations of Diamond Shield and each received over $400,000 in payments during the life of the company.
In February 2009, Fancher filed a lawsuit complaining that he was denied access to the building and records of Diamond Shield. In March 2009, while reviewing the company’s financial records, Fancher learned of the OST loan agreement and about various leasing arrangements that were done without his knowledge. Asserting that the OST loan agreement was a primary breach of confidence, Fancher *912 sought withdrawal from Diamond Shield by letter dated May 13, 2009. The next day, Robbins and Prudhome refused Fancher’s demand. The plaintiff, Fancher, then filed an amended petition for withdrawal and for a determination of the value of his share in the company. In December 2009, the trial court granted plaintiffs motion for partial summary judgment and allowed him to withdraw his membership in Diamond Shield retroactive to May 13, 2009.
At trial, the issue was the determination of the fail' market value of the plaintiffs one-third interest in Diamond Shield at the time of his withdrawal. The plaintiff presented the expert testimony of Ben Woods, CPA, who opined that Diamond Shield’s fair market value was $2,000,000 and that plaintiffs share equaled $666,666. Wood’s calculations were | abased on a “going concern” analysis and he did not reduce the amount by discounts.
In its written ruling, the trial court noted that as a minority interest holder in Diamond Shield, plaintiff could not make business decisions or require distributions. The trial court found that because of plaintiffs unique role in providing almost the exclusive source of business to Diamond Shield, his interest was not marketable because its value was indistinguishable from plaintiff himself. Thus, the court concluded that the fair market value of plaintiffs interest would be more accurately attained by using the book value of all company equity, which Woods listed as $37,768.90. The trial court rendered judgment setting the value of plaintiffs one-third interest in the company at $12,463.74. In denying plaintiffs motion for new trial, the court found that Robbins and Prudhome were not personally liable for the debts of Diamond Shield, because they had not acted with gross negligence. The plaintiff appeals the judgment.
DISCUSSION
The plaintiff contends the trial court erred in valuing his interest in Diamond Shield. Plaintiff argues that the court’s determination of value failed to consider all of the company’s assets at the time of his withdrawal.
A withdrawing or resigning member of a limited liability company is entitled to receive the fair market value of the member’s interest as of the date of withdrawal. LSA-R.S. 12:1325(C). Generally, fair market value is the price a willing buyer would pay to a willing seller for a certain item of property in an arm’s length transaction. Cannon v. Bertrand, 08-1073 (La.1/21/09), 2 So.3d 393. The determination of fair market value may be subject to discounts to reflect that the member’s share is a minority interest or that the interest is less marketable for various reasons. Such minority or lack of marketability discounts should be used sparingly and only when the facts support their use. Cannon, supra. The value of a withdrawing member’s interest may be determined in a number of ways, including book value, market value of the underlying company assets, fair market value of the member’s interest or other means, depending on the circumstances requiring the valuation. See Cannon, supra.
In the present case, plaintiff presented the testimony of Benjamin Woods, CPA, who was accepted as an expert in business valuation. Woods testified that in determining the value of Diamond Shield, he had reviewed the company’s tax returns and year-end financial statements for 2008 and 2009. Woods explained that businesses can be valued under an asset, income or market approach and that he had used a going concern analysis, which assumes the business will continue in operation.
*913 Woods testified that his assets-approach value was based on the assets listed on the books of Diamond Shield for the year ending in December 2008. Woods stated the unadjusted book value of all equity was $87,769. To determine the adjusted, or fair market, value of those assets, Woods applied estimates for Diamond Shield’s inventory and accounts receivable based on published IRS data. Woods explained that the income, or discounted cash flow, method involves forecasting future company earnings and then applying a discount to get the present value. He stated |5that the market approach uses prior sales of comparable companies in the same industry to determine value.
In determining Diamond Shield’s value, the trial court found that the income approach was not applicable because the company’s future cash flow could not be assumed given the plaintiffs role in providing almost all of its business. The court also found that the market approach did not apply because Diamond Shield was a small, closely held company with profits tied to the skill of its members, so that plaintiffs interest was indistinguishable from himself. Based upon this record, we cannot say the trial court’s factual findings are clearly wrong. Thus, the court did not err in using the asset approach to determine the value of Diamond Shield.
In his appellate brief, the plaintiff refers to a footnote in the trial court’s written ruling and contends the' court incorrectly applied a minority discount to reduce the value of his interest as determined by Woods. Although the court discussed discounts in describing the nature of plaintiffs interest and the reason why the income and market approaches were not applicable, the court did not apply a discount in selecting the book value of the company’s equity as the basis of fair market value. Thus, the plaintiffs contention lacks merit.
The plaintiff argues that the trial court was clearly wrong in valuing the assets of Diamond Shield because at the time of his withdrawal in May 2009, the company possessed an additional $500,000 cash in its bank account. In his report, Woods listed the net book value of the company as $37,769 as of December 2008. Woods testified that he had not received | information about assets that the company owned in May 2009.
Marlon Barlow, an accountant, testified that he had prepared Diamond Shield’s year-end financial statements and federal tax returns for the years 2008, 2009 and 2010. Barlow stated that the company reported a loss of $97,915 in 2009 resulting from a decline in business that occurred in the third or fourth quarter of that year. Barlow testified that in May or June 2009, he had recommended that Diamond Shield increase the salaries of its members because there was “a lot of money in the bank” at the time.
The plaintiff asserts that Barlow’s testimony proves that Diamond Shield’s value was at least $500,000 in May 2009. However, we note that although Barlow testified that the company had a lot of money in the bank, he did not specify the amount of $500,000 and at trial, plaintiff did not ask Barlow whether he knew the amount of cash contained in Diamond Shield’s bank account in May 2009. Thus, we cannot say the trial court was clearly wrong in finding that the evidence failed to show that Diamond Shield had $500,000 cash in May 2009.
The plaintiff also contends the trial court should have accepted Woods’ expert testimony that the fair market value of all equity, or Diamond Shield’s adjusted book value, was $686,403. The trier *914 of fact is entitled to assess the credibility and weigh the opinion of an expert just as with other witnesses. The effect and weight given to the expert’s testimony depends upon the validity of the underlying facts relied upon by the expert and rests within the broad discretion of the trial court. Head v. Head, 30,585 (La.App.2d Cir.5/22/98), 714 So.2d 231.
|7In this case, Woods testified that the figure for the company’s adjusted book value included his estimates of amounts for inventory and accounts receivable derived from IRS ratio data. As the trial court pointed out, the evidence did not show that the inventory amount was accurate, since the company leased most of its equipment and provided workers for jobs, so that there was no need to keep an inventory of goods. Nor was it shown that the IRS ratio data corresponded to the company’s actual accounts receivable in May 2009.
Based upon the evidence presented, we cannot say the trial court abused its discretion in using the book value of the company’s assets in determining that the fair market value of the plaintiffs interest is the amount of $12,463.74. Thus, the assignment of error lacks merit.

Liability

The plaintiff contends the trial court erred in finding that Robbins and Prudhome were not personally liable to pay his withdrawal distribution. The plaintiff argues that Robbins and Pru-dhome are liable because they were grossly negligent in agreeing to a loan contract assigning 50% of Diamond Shield’s profits to OST.
A member who is a manager has a fiduciary duty to the limited liability company and its members. LSA-R.S. 12:1314(A)(1). A member or manager shall not be personally liable to the limited liability company or its members for monetary damages unless he acted in a grossly negligent manner. LSA-R.S. 12:1314(B). Gross negligence is defined as a reckless disregard of, or a carelessness amounting to indifference to, the best | ^interests of the limited liability company or its members. LSA-R.S. 12:1314(0).
In the present case, William Robbins testified that when Diamond Shield was formed, he thought that Fancher would loan the company sufficient money to operate until it began receiving payment for work performed. Robbins stated that Fancher did not provide such funding. Robbins testified that he signed the loan agreement with OST because the money was necessary to keep Diamond Shield operating.
Ray Fancher testified that when he became a member of the company he loaned $15,000 to Diamond Shield, which repaid the money without interest. Fancher stated that he did not loan any additional money to the company, but that he did help Diamond Shield get work from NFR Energy.
Based upon the evidence presented, we cannot say the trial court was clearly wrong in finding that Robbins and Pru-dhome did not act with reckless disregard of the best interests of Diamond Shield by agreeing to a loan that was necessary to keep the company operating. Thus, the plaintiffs argument that Robbins and Pru-dhome are personally liable due to gross negligence lacks merit.
The plaintiff also argues that Robbins and Prudhome are personally liable for the plaintiffs withdrawal distribution because they accepted distributions of $166,000, despite knowing that Diamond Shield was indebted to plaintiff for his one-third interest. No distribution shall be made if as a result, the limited liability company would not be able to pay its debts as they become due in the usual course of *915 business. LSA-R.S. |fl12:1327(A)(l). Each member who knowingly votes for or assents to a distribution in violation of Section 1327 shall be jointly and severally liable to the limited liability company for the amount of the distribution that exceeds the amount which could have been lawfully distributed. LSA-R.S. 12:1328.
In the present case, the plaintiff has not presented evidence to support his assertion that the September 2009 distributions to Robbins and Prudhome caused Diamond Shield to be unable to pay its debts as they became due. In September 2009, the company also reserved the amount of $300,000 for the cost of operations. Plaintiff has not shown that this amount was insufficient to pay the company’s debts as they became due in the ordinary course of business. Based upon this record, the evidence does not demonstrate that the September 2009 distributions were in violation of the statute. Consequently, the assignment of error lacks merit.
CONCLUSION
For the forgoing reasons, the trial court’s judgment is affirmed. Costs of this appeal are assessed to the appellant, Ray Fancher.
AFFIRMED.
APPLICATION FOR REHEARING
Before WILLIAMS, CARAWAY, DREW, MOORE and HARRISON (Ad Hoc), JJ.
Rehearing denied.