STEPHENS, J.
Defendants, Gregory W. Bryan, DPM, Michelle R. Ritter, M.D., R. Blair Drummond, DPM, Janna Cruey-Roark, and Ambulatory Surgery Center of Louisiana, L.L.C., appeal judgments by the First Judicial District Court, Parish of Caddo, State of Louisiana, determining the valuation method and price to be paid to plaintiff, Forrest P. Wall, M.D., F.A.C.S., for his ownership interest in Ambulatory Surgery Center of Louisiana, L.L.C. Plaintiff has answered the appeal and appeals the judgment determining the price to be paid. For the following reason, we affirm the trial court's judgments.
FACTS AND PROCEDURAL HISTORY
Forrest P. Wall, M.D., F.A.C.S., brought suit against Gregory W. Bryan, DPM, Michelle R. Ritter, M.D., R. Blair Drummond, DPM, Janna Cruey-Roark, and Ambulatory Surgery Center of Louisiana, L.L.C. ("ASC"[1] ), in connection with his *653 imminent disqualification as a member of ASC and the forced sale of his ownership interest in ASC that would follow.
ASC is a limited liability company medical practice. At the outset of this litigation, Dr. Wall, Dr. Bryan, Dr. Ritter, and Dr. Drummond were members of ASC's medical staff as well as ASC's board, and Ms. Roark was an employee and the administrator of ASC. In 2007, the members entered into an agreement entitled Operating Agreement of Ambulatory Surgery Center of Louisiana, L.L.C. ("the Operating Agreement"), which governed the management of ASC. It mandated that in order to maintain ownership in ASC, a person must maintain full and unrestricted privileges on ASC's professional staff. Dr. Wall was subsequently suspended from ASC on April 15, 2015. Pursuant to the Operating Agreement, this suspension not only disqualified Dr. Wall from membership in ASC but also barred him from owning any interest in ASC. The Operating Agreement contemplated several scenarios for valuing a withdrawing member's interest, and each of these scenarios required the value of the interest to be calculated in accordance with either "book value" or "computed value."
Following his suspension from ASC, Dr. Wall filed suit seeking damages and injunctive relief to prevent ASC from denying him privileges. A temporary restraining order was issued barring ASC from taking any adverse action against Dr. Wall. Thereafter, the attorneys for the parties signed an agreement, the Confidential Agreement in Principal[2] ("the Agreement in Principle"), which specifically contemplated the execution of final settlement agreements by the parties. The Agreement in Principle provided in pertinent part that "the value of Dr. Wall's interest [is to be] determined in accordance with the ASC Operating Agreement provisions for Voluntary Separation." Voluntary Separation was one of the scenarios contemplated in the Operating Agreement in which either book value or computed value was to be used to value a withdrawing member's interest.
The parties subsequently signed an agreement, the Confidential Settlement and Release ("Settlement Agreement"), pursuant to which Dr. Wall's suspension was rescinded and expunged and all ancillary disputes between the parties were settled except for one: the price to be paid to Dr. Wall for his 24.75% ownership interest in ASC. The Settlement Agreement further provided that in the event the parties were not able to agree on a price, they would seek a determination by the trial court. However, the Settlement Agreement did not specify the method for calculating the value of Dr. Wall's interest, thus triggering the applicability of La. R.S. 12:1325(C), which requires the use of fair market value to determine the value of a withdrawing member's interest when no method is otherwise specified.
A hearing was subsequently held to determine which written agreement between the parties should dictate the valuation method used to calculate the price to be paid Dr. Wall for his ownership interest in ASC. ASC contended that the Operating Agreement and/or Agreement in Principle controlled the method of valuation, which would result in a book or computed value. Dr. Wall asserted the Settlement Agreement controlled, and, therefore, in accordance with La. R.S. 12:1325(C), fair market value was the appropriate method of *654 valuation. A fair market value of Dr. Wall's interest would be substantially higher than a book or computed value.
Ultimately, the trial court concluded that the Settlement Agreement superseded all prior agreements between the parties, specifically, the Agreement in Principle and the Operating Agreement. The trial court reasoned that the following language of the Settlement Agreement was clear and unambiguous and left no room for an alternative interpretation: "This agreement supersedes all prior understandings, negotiations, and agreements between and among the parties." The court further concluded that since the Settlement Agreement did not specify the method for calculating the value of Dr. Wall's interest in ASC, the value should be fair market, in accordance with the requirements of La. R.S. 12:1325(C).
Another hearing was held to determine the fair market value of Dr. Wall's 24.75% interest in ASC. Dr. Wall presented expert testimony from Benjamin C. Woods while ASC presented expert testimony from Stuart Neiberg. Woods is a certified public accountant, a certified valuation analyst, and accredited in business valuation. He testified that approximately 90% of his work consists of business valuation of closely-held businesses, and over the last four or five years, he has valued roughly 18 to 20 medical-field organizations, including five or six surgery centers or related entities. Here, Woods stated his assigned objective was to determine the fair market value of a 24.75% interest in ASC as of April 2015. He testified that in doing so, he considered three different valuation approaches: the asset approach, the income approach, and the market approach. He explained that he determined the income approach was the most appropriate method in this case. Woods also calculated the value using the market approach to use a "self-check" on the income approach. He chose not to calculate the asset approach at all, stating it rarely represented intangible assets. Woods' opinion was that the fair market value of Dr. Wall's interest was $873,146.00. He did not apply any discounts to this value. Regarding whether or not Dr. Wall's interest should be subjected to any discounts, Woods gave the following testimony:
I am aware that Louisiana courts and different courts have different interpretations of what is equitable in the court of law. My assignment is [to] determine the fair market value to a hypothetical buyer and seller on an open market, with both having knowledge of the facts. And then, you know, the courts can apply what we do in any way they choose, that's their discretion.
However, while not a stated "minority discount," Woods did apply an embedded adjustment when initially calculating the value of Dr. Wall's 24.75% interest. Woods testified that this embedded minority discount[3] accounted for the fact that Dr. Wall's interest was a noncontrolling interest in ASC, and the embedded discount was necessary in order to arrive at a fair market value rather than just a fair value. Additionally, he testified that the 15% minority discount applied by Neiberg was reasonable.
Regarding the applicability of a lack of marketability discount, Woods testified his research showed this type of minority interest in ambulatory surgery centers sells readily in the marketplace as there are numerous physician-owned entities like ASC in existence and several big companies that are consolidating these interests, *655 as well as hospitals and other physicians creating the market-a unique situation from other closely-held entities. Accordingly, Woods elected not to apply a lack of marketability discount. He testified that a typical lack of marketability discount is usually 30-35% and the 25% lack of marketability discount applied by Neiberg was not egregious; rather, it was just in error because there actually is a market for minority interests in surgical centers. However, Woods did acknowledge that an investment in any closely-held company contains a greater degree of risk than one in publicly traded stocks due to lack of marketability, size, diversity, and other factors. Notably, part of the research relied on by Woods to justify not applying a marketability discount is a 2015 valuation survey of ambulatory surgery centers that was prepared by Neiberg's company. Woods asserted the survey indicated there is in fact a market for a minority interest in ambulatory surgery centers.
Neiberg is a certified public accountant and a certified financial analyst who is a partner in the company HealthCare Appraisers, Incorporated ("HAI"). HAI almost exclusively handles valuations of healthcare entities, and Neiberg has conducted more than 200 valuations of ambulatory surgery centers. He testified that his assigned objective was to determine the fair market value of a 24.75% interest in ASC as of April 15, 2015.[4] In calculating his valuation, Neiberg relied on the definition of "fair market value" contained in the International Glossary of Business Valuation Terms and accepted by the American Society of Appraisers: "the price in terms of cash equivalents at which property would change hands between a hypothetical willing buyer and a hypothetical willing seller, acting at arm's length in an open and unrestrictive market when neither is under any compulsion to buy or sell, when both have reasonable knowledge of the facts." Like Woods, Neiberg identified three potential valuation approaches: market, income, and asset. He utilized both the market and income approaches. Neiberg explained the market approach and determined the range for the fair market value of Dr. Wall's interest to be $647,955.00-$699,683.00. Using the income approach, he determined the fair market value to be $681,000.00.
In calculating his valuation, Neiberg applied a 15% minority discount and 25% lack of marketability discount.[5] Neiberg testified that in almost every transaction that he has ever worked on for a noncontrolling interest in an ambulatory surgery center, approximately 200 of those types of transactions, there was both a minority discount and a lack of marketability discount applied.
In the survey conducted by HAI that was relied on by both Neiberg and Woods, the median minority discount among the database of transactions analyzed was 26.6%, and the typical lack of marketability discount was 66.4%. However, when calculating the value of Dr. Wall's interest in ASC, Neiberg applied only a 15% minority discount, making subjective adjustments to the minority discount based on the unique characteristics of ambulatory surgery centers as opposed to other healthcare entities. For example, the owners of ambulatory surgery centers are usually also the managers and the operators of the business, so it is unlikely that other owners *656 and operators would act adversely to a particular interest holder because doing so would severely hurt their own financial interests as well.
Additionally, Neiberg applied only a 25% lack of marketability discount because unlike owners of other healthcare entities or closely-held businesses, owners of surgery centers continue to receive distributions from that surgery center while they are waiting to sell their interest, making the interest more marketable to a potential investor. But, because there is still no instantaneous sale of shares like those traded on a public exchange, some sort of discount for lack of marketability must be applied to closely-held businesses in order to arrive at a fair market value. Neiberg testified that he believed Woods misinterpreted the results of HAI's survey in that even if there is a marketplace for minority interests in surgery centers, the lag time in which to consummate a transaction still creates the need to incorporate some sort of discount for lack of marketability. Furthermore, regarding Woods' reliance on HAI's survey as evidence of ASC's marketability, Neiberg testified that zero percent of the subjects in the survey were interested in acquiring a minority interest in ambulatory surgical centers with less than 11 members.
Neiberg testified that excluding the discounts in this particular case would result in a fair value calculation, not fair market value. While Neiberg and Woods both testified there is not a generally accepted defined term for fair value (as opposed to fair market value), Neiberg further stated his experience that many state courts have accepted that fair value would exclude the use of valuation discounts. Furthermore, Neiberg testified that considering the existing owners of ASC were acquiring Dr. Wall's interest would also result in a departure from the fair market standard because the value would no longer be considering a hypothetical buyer but a specific buyer.
After hearing the expert witnesses, the trial court issued a comprehensive written opinion and judgment holding the expert testimony and the circumstances of the case warranted the application of both the minority and the lack of marketability discounts. It ordered the fair market value of Dr. Wall's interest in ASC to be $673.819.00. This appeal by ASC of both judgments issued by the trial court ensued, along with an answer to the appeal by Dr. Wall.
DISCUSSION
On appeal, ASC asserts the following assignments of error: the trial court erred in determining the Settlement Agreement controls the method for calculating the price to be paid Dr. Wall for his interest; the trial court erred in determining the Settlement Agreement supersedes both the Operating Agreement and the Agreement in Principle; the trial court erred in determining that the fair market value basis applies to the valuation of Dr. Wall's interest; and, the trial court erred in determining the amount of damages due to Dr. Wall.
Controlling Agreement
A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La. C.C. art. 1906. Contracts have the effect of law for the parties. La. C.C. art. 1983. Interpretation of a contract is the determination of the common intent of the parties. La. C.C. art. 2045 ; BRP LLC (Delaware) v. MC Louisiana Minerals LLC , 50,549 (La. App. 2 Cir. 5/18/16), 196 So.3d 37. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be *657 made in search of the parties' intent. La. C.C. art. 2046 ; Id.
Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract, unless the written expression of the common intention of the parties is ambiguous. BRP LLC (Delaware), supra . A contract is considered ambiguous on the issue of intent when either it lacks a provision on that issue, the terms of a written contract are susceptible to more than one interpretation, there is uncertainty or ambiguity as to its provisions, or the intent of the parties cannot be ascertained from the language employed. Id. The trial court's initial inquiry should be whether the words of the contract clearly and explicitly set forth the intent of the parties. Id. This methodology limits the interpretation of a contract to the internal language of the contract itself. Id. If this intent cannot be adequately discerned from the contract itself, the court may then consider evidence as to the facts and circumstances surrounding the parties at the time the contract was made. Id.
Also known as a merger clause, or an entire-agreement clause, an integration clause is a contractual provision stating that the contract represents the parties' complete and final agreement. Integration Clause, Black's Law Dictionary (10th ed. 2014). An integration clause precludes any prior or contemporaneous agreements which are not set forth in the contract. Driver Pipeline Co. v. Cadeville Gas Storage, LLC , 49,375 (La. App. 2 Cir. 10/1/14), 150 So.3d 492, writ denied , 2014-2304 (La. 1/23/15), 159 So.3d 1058.
Here, ASC asserts the language in the integration and merger clause contained in Section 4.7 of the Settlement Agreement entitled "Entire Agreement" does not preclude the Operating Agreement and Agreement in Principle but, instead, evidences the parties' intent for the provisions of those previous agreements to remain in effect. The clause at issue states:
This Agreement and its Exhibits and the referral documents whose terms are incorporated herein, is the entire agreement between and among the Parties and no modification shall be effective unless in writing and signed by the party against whom or which it is sought to be enforced. This Agreement supersedes all prior understandings, negotiations, and agreements between and among the Parties. The Parties represent and warrant no promise of inducement has been given to them other than such promises and inducements as set for the herein and, in executing this Agreement, the Parties are not relying upon any statement, representation, or commitment of any kind not stated herein and, are relying only upon the statements, representations and warranties set forth herein[.]
ASC argues that the Agreement in Principle is a referral document incorporated into the Settlement Agreement, and this integration clause establishes the parties' intent for the Agreement in Principle to be part of the entire agreement among the parties. As neither the Agreement in Principle nor the Operating Agreement was attached as an exhibit to the Settlement Agreement, the basis for ASC's argument is a single reference to the Agreement in Principle that appears in the recitals of the Settlement Agreement. The pertinent recital reads as follows: "WHEREAS, the Parties have previously entered into a "Confidential Agreement in Princip[le]" on June 23, 2015, ("Confidential Agreement"), pursuant to which the parties agreed to resolve their differences without resort to further litigation[.]" ASC asserts the Operating Agreement should, therefore, control the method of valuation since the Agreement in Principle requires the value of Dr. *658 Wall's interest to be calculated in accordance with the provisions of the Operating Agreement. ASC also argues that prior drafts of the Settlement Agreement indicate the parties intended for the Operating Agreement to control the method of valuation.
The trial court held that the Settlement Agreement superseded both the Agreement in Principle and the Operating Agreement. The trial court reasoned that because the Agreement in Principle provided it was "subject to the reduction to writing of the final agreements and the execution thereof by the appropriate authorized representatives," the Agreement in Principle was essentially only an "agreement-to-agree" and did not bind the parties to its terms. We agree.
In Driver Pipeline Co. , supra , the court found the following language of the contract comprised a valid and sufficient integration clause:
This Contract and the Exhibits hereto constitute the entire agreement between the Parties hereto with respect to the matters covered hereby. No statements, representations, warranties, or agreements with respect to such matters, written or oral, except those expressly set out in this Contract or expressly incorporated herein by reference, shall have any further force or effect between the Parties, or shall same be relied on by the Parties hereto, it being agreed that this Contract supersedes all prior negotiations and understandings. This Contract can be hereafter modified or amended only by a document duly executed by the authorized official of each of the Parties. This Contract shall be binding upon the Parties hereto, their heirs, executors, administrators, successors or permitted assigns.
Id. at 501. Similarly, here, the language of the Settlement Agreement, and in particular the merger and integration clause, clearly and explicitly set forth the parties' intent that the Settlement Agreement superseded all prior agreements and understandings, including the Agreement in Principle and Operating Agreement. Accordingly, where the language of the Settlement Agreement is clear and unambiguous and can lead to no alternative conclusion other than that Dr. Wall and ASC intended for the Settlement Agreement, alone, to form the law between the parties, no other interpretation in search of the parties' intent is permitted with regard to prior drafts of the Settlement Agreement or the single mention of the Agreement in Principle in its recitals. Therefore, the trial court was not plainly wrong in holding the Settlement Agreement superseded the Agreement in Principle and the Operating Agreement. ASC's assignments of error on this issue are without merit.
Basis for Valuation
The trial court further held that the Settlement Agreement controlled the basis of valuation to be used in determining the price to be paid for Dr. Wall's interest in ASC and ordered the value be calculated according to La. R.S. 12:1325(C), which provides:
Except as otherwise provided in this Chapter, on withdrawal or resignation, a withdrawing or resigning member is entitled to receive such distribution, if any, to which the member is entitled under a written operating agreement and, if not otherwise provided in a written operating agreement , within a reasonable time after withdrawal or resignation, the fair market value of the member's interest as of the date of the member's withdrawal or resignation . (Emphasis added).
*659 As discussed herein, the Settlement Agreement superseded the Agreement in Principle and the Operating Agreement; thus the methods for calculating a withdrawing member's interest provided in those documents are not applicable. Because the Settlement Agreement does not specify the method for calculating the value of Dr. Wall's interest in ASC, we look, as the trial court did to La. R. S. 12:1325(C) in ordering that Dr. Wall's interest be determined in accordance with the fair market value basis. We conclude that the value assigned by the trial court was not in error and this assignment of error is without merit.
Damages
ASC failed to brief its fourth assignment of error regarding the damages awarded; therefore, that assignment of error is abandoned. See, U.R.C.A. Rule 2-12.4, where an appellant fails to brief an assignment of error, the appeal court may deem that assignment abandoned. Lawson v. Lawson , 48,296 (La. App. 2 Cir. 7/24/13), 121 So.3d 769, 775.
Application of Discounts
Dr. Wall answered the appeal and asserts in his own assignment of error that the trial court erred by applying discounts to the valuation of his interest in ASC. After extensive and competent testimony by both Woods and Neiberg, and multiple pre- and post-trial memorandums submitted by Dr. Wall and ASC, the trial court issued thorough written reasons, holding that in this particular case, the discounts applied by ASC's expert, Neiberg, were appropriate.
The trial court's factual findings will not be overturned unless they are clearly wrong or manifestly erroneous. In re P.K. Smith Motors, Inc., 50,357 (La. App. 2 Cir. 3/9/16), 188 So.3d 324, writ denied, 2016-0852 (La. 6/17/16), 192 So.3d 771. The manifest error standard of review demands great deference to findings based on the credibility of witnesses. Id. The rule governing review of credibility determinations applies to the evaluation of expert testimony, including the resolution of conflicts in such testimony. Id.
Here, the trial court made a factual determination that given the particular facts and circumstances of the case, the fair market value of ASC was most accurately calculated by Neiberg. The trial court found Neiberg to be a more credible, qualified, and reliable expert than Woods. It was apparently particularly convinced by Neiberg's definition of fair market value and the notion that it hinges on both the contemplation of a hypothetical buyer and hypothetical seller, and the application of discounts, without which the value would be just fair value-not fair market value. These credibility determinations by the trial court were not clearly wrong.
Further, we recognize Dr. Wall's reliance on Cannon v. Bertrand , 2008-1073 (La. 1/21/09), 2 So.3d 393, but Cannon can be distinguished from the present case. The Louisiana Supreme Court held in Cannon that "[m]inority discounts and other discounts, such as for lack of marketability, may have a place in our law; however, such discounts must be used sparingly and only when the facts support their use." Id. at 396. While Cannon did involve the buyout of a minority owner's interest by the remaining members of the entity, that entity was a limited liability partnership rather than a limited liability company. The amount due a partner withdrawing from a limited liability partnership is governed by La. C.C. art. 2823, which provides as follows: "The former partner, his successors, or the seizing creditor is entitled to an amount equal to the value that the share of the former partner had at the time membership ceased." Thus, unlike the *660 present case, there was no requirement in Cannon that the value calculated be fair market value. Rather, in Cannon, the appropriate valuation methodology and the applicability of any discounts were left to the sound discretion of the court. This flexibility in the basis for valuation increases a court's ability to avoid discounts while still achieving equitable results. Steven G. (Buzz) Durio, Discounts in Business Valuations After Cannon v. Bertrand , 57 La. B.J. 24, 27 (2009). Additionally, with regard to Cannon , the court specifically conceded that it cannot fashion a "one size fits all" method of valuation which would be fair in all cases. Cannon, supra at 397. Simply put, Cannon did not universally bar the application of discounts, considering particular factual differences that might occur.
In Fancher v. Prudhome , 47,575 (La. App. 2 Cir. 2/27/13), 112 So.3d 909, we applied the holding in Cannon to a limited liability company. Notably, however, Fancher , unlike Cannon , did not reverse a trial court's application of discounts. Instead, Fancher simply affirmed the trial court's finding of fact that the asset approach/book value, without the application of discounts, most accurately depicted, under its particular circumstances, the fair market value of the withdrawing member's interest.
Conversely, as recently as 2016, this court upheld a trial court's exercise of its discretion in applying discounts. See In re P.K. Smith Motors, Inc., supra, where the trial court applied a lack of marketability discount to the price to be paid to the estate of a deceased shareholder selling its shares back to the family-owned corporation when the parties agreed their intent was for a fair market value or fair price to be the basis for valuation. Furthermore, both the first and the fifth circuits have distinguished Cannon and affirmed the application of post- Cannon discounts in valuations of limited liability companies. See Vedros v. Vedros , 2016-735 (La. App. 5 Cir. 10/25/17), 229 So.3d 677, writ denied, 2017-02119 (La. 2/23/18), 237 So.3d 1185, and writ denied , 2018-0004 (La. 2/23/18), 237 So.3d 520 ; Trahan v. Trahan , 2010-0109 (La. App. 1 Cir. 6/11/10), 43 So.3d 218, writ denied , 2010-2014 (La. 11/12/10), 49 So.3d 889.
Furthermore, while the mandate of the supreme court in Cannon is that discounts should be used sparingly, it is actually the industry standard for both minority and lack of marketability discounts to be applied to noncontrolling interests in ambulatory surgery centers. The record clearly shows that Neiberg is an expert in not just valuation of closely-held companies, but specifically in ambulatory surgery centers, and the trial court was by no means clearly wrong in placing great weight in his testimony. The trial court simply exercised the discretion Cannon afforded it and applied the discounts it thought best to achieve an equitable outcome within the constraints of the statutorily required fair market value basis. Accordingly, Dr. Wall's assignment of error is without merit.
CONCLUSION
For the foregoing reasons, we affirm the judgments of the trial court. All costs of this appeal are assessed equally between the parties.
AFFIRMED .

"ASC" is used throughout in reference not only to Ambulatory Surgery Center of Louisiana, L.L.C., but also in reference to all of the defendants, collectively.

Although the initial contract was inadvertently entitled Agreement in "Principal," the grammatically correct spelling is "Principle" and will be used hereafter in this opinion.

The term "minority discount" is used interchangeably throughout the record with the terms "noncontrolling discount" and "lack of control discount."

He actually valued the ASC up to April 30th, but testified there was no significant difference.

The total discount ultimately applied, according to the formula used, was 34.1%, which was a combination of the lack of control and lack of marketability discounts.